**TEXASGULF, INC., Plaintiff,**

v.

**CANADA DEVELOPMENT CORPORA-TION et al., Defendants.**

**Civ. A. No. 73-H-1056.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 5, 1973.

Baker & Botts, William C. Harvin and Thomas M. Phillips, Houston, Tex., for plaintiff.

Hutcheson & Grundy, Thad T. Hutcheson and Charles R. Gregg, Houston, Tex., Jenkins, Spradley & Gilchrist, Wilson A. Hanna and Marshall Simmons, Dallas, Tex., Stroock, Stroock & Lavin, David Lubart, Charles G. Moerdler and Stephen A. Block, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

SEALS, District Judge.

The attempted acquisition of Texasgulf, Inc. by the Canada Development Corporation, through the use of a public tender offer, came as a complete surprise and shock to the target company, according to the secure and well entrenched management of Texasgulf. Although the acquiring company, the Canada Development Corporation (CDC), did, and understandably so, plan and execute in secret and in haste their tender offer, it is somewhat surprising that Texasgulf was so surprised. Especially is this true when the evidence in the case indicates that the bulk of the income and sales of Texasgulf come from Canada predominantly and, also, because of the increasing use of the tender offer as a modern means of corporate acquisition.[1]

The notice of the tender offer given to the management of Texasgulf by CDC late in the afternoon of July 24, 1973, was in the words of Texasgulf's lead trial attorney, William C. Harvin, Esq., a Pearl Harbor like attack with the avowed purpose of stunning Texasgulf and overwhelming them. But, Texasgulf, the target company, was not so surprised, stunned or overwhelmed as to cause the management to hesitate or falter. The Board of Directors of Texasgulf began to convene on the next day

1. Texasgulf's Original Complaint filed on July 27, 1973, three days after the tender offer was made, states in Paragraph VI, "On or about January of 1973, CDC began a searching investigation of Texasgulf with a view toward attempting to acquire this worldwide natural resources and mining company. Beginning in March of this year it secretly began to ac-quire the common stock of Texasgulf on the open market until shortly prior to its announced takeover attempt it had acquired 748,000 shares or approximately 2½% of the outstanding common stock of Texasgulf, thereby making the Canadian government one of the largest stockholders of Texasgulf and the largest Canadian stockholder."

and during July 25 and 26, 1973, rejected any negotiated truce or peace and placed its whole defense and counterattack in the hands of their attorney and a fellow Board member, Thomas M. Phillips, Esq., of the law firm of Baker & Botts of Houston, Texas, who had been representing Texasgulf for over a quarter of a century. In his closing argument to the Court, Phillips expressed in poignant words, which the Court feels represents the sentiments of Texasgulf's management, " . . . and so it must be obvious to Your Honor, that much of my career and much of my personal life has been identified with Texasgulf.[2]

2. Record at 1923. The complete and final closing argument of the distinguished attorney and director of Texasgulf is set out in full below to demonstrate how Texasgulf views this case.

"MR. PHILLIPS: If you please, Your Honor.

"Heretofore, may it please the Court, I had not thought it appropriate to take an active part in this hearing. I had thought it more appropriate to take a passive and a silent part. My reason for that position, I think, is obvious.

"The first case I ever tried, or really the first case of any real importance, was assigned to me by a Mr. Jesse Andrews. I had the honor of trying that case in this court before one of your truly great and distinguished predecessors, the Honorable T. M. Kennerly. My client was Texasgulf.

"A few years before that, Your Honor, I had been brought to Houston as a country boy, not dried behind the ears, dirt poor, and honestly with an ignorance that bordered only ignorancy. The man who brought me here, Frank Coates, died, and literally died in the service of Texasgulf.

"And now, for the past few years, I have had the privilege of serving as a director on the board of this company, and so it must be obvious to Your Honor that much of my career and much of my personal life has been identified with Texasgulf.

"It has been claimed that management, and I suppose I am a part of management, is seeking to perpetuate itself in power, intrench itself inkeeping our jobs. And as ludricous as those charges may be, I suppose it's nevertheless true that it could be claimed that anything I might say was suspect and self'serving, and so, I was content to remain passive and silent until I read the concluding brief filed in this case. And in that brief, I'm sorry to say, you will find that these lawyers have gone much further than claiming that management is seeking to perpetuate its self in power. We are accused of bringing to this Court trumped up and spurlous charges. We are accused of engaging in one sham ploy after another. It is claimed that we are motivated by paranoic force—I believe that's the phrase that has led us to misleading the Court, engaging in deleterious tactics and pursuing false and frivolous accusations.

"These are the charges, may it please the Court, that no lawyer is obliged to sit and endure in silence, and so, with your indulgence, I should like to make a brief reply.

"I realize the hour is late, it's past your usual adjournment time. I assure you I won't take long.

"I would begin by asking this Court to take a broad overview of what here is at issue. Because it is at the very threshhold that we find ourselves in sharp dispute with the other side. There is no doubt that if this case is tried eventually on the merits, it will indeed be a complicated and an involved case. But at the moment, right now, this court is only concerned with whether, in the exercise of sound discretion, it will or will not grant a preliminary injunction. It is here at the threshhold that we find the first dispute.

"It is our position, to put it as simply as I may, that in order to resolve this matter, the Court need ask itself only three simply questions: First, is there a public interest to be protected? We do not claim, we have never claimed that this court or any court has the right to make national policy or make any new law. But neither, Your Honor, do we accede to the view that this court or any court may close its eye to the public interest when this court or any court is called upon to exercise sound discretion. And may heaven help us if the day ever comes when in the administration of justice this court or any court must ignore public interest.

"The second question, has there been a clear showing of sufficiently serious questions that present fair grounds for further investigation and for a trial on the merits? It seems to us that this court may answer this question in the negative only if the court is also willing to say that now for three weeks we have engaged in frivolous, sham, scurlous ploys. If this court really believes that, you should deny this preliminary injunction.

"Third, this court must ask itself if the balance of hardships tips it decidedly in favor of the plaintiff. Put another way, is this an indication for the maintenance of the status quo until there can be a ferreting out of all of the facts and a resolution finally of the difficult questions that have been presented.

"We say those are the three questions that you must ask. Our authority is stated in our brief.

"Let me, at the risk of being repetitious, because it seems to me highly important for this Court to understand what is the standard, what is the issue, I quote from a very recent case: 'The settle rule is that a preliminary injunction should issue upon a clearer showing of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the power requesting the preliminary leave.' In these past three weeks, the illusion has been created, if so, accidentally, that this has been a trial on the merits. The hearing has lasted longer than many trials on the merits. The evidence has been sharply conflicting, and I think it's safe to say that every point has been contested. And, Your Honor, while this obviously is not a trial on the merits, let me ask you for just a moment to continue the illusion.

"Suppose, Your Honor, that you had a jury sitting over here in this box and that at this moment you were faced with the necessity of deciding what to do, whether to withdraw the case or to submit it to the jury. What would Your Honor do? Take the evidence and the issue of conspiracy. There's no doubt about it. The evidence and the testimony is in sharp conflict. Bear in mind, if you please, that the courts have said time and time again that conspiracies are not hatched in the light of day, and conspirators rarely confess.

"Take the evidence, which Mr. Harvin has outlined here, of conspiracy, picking them off point by point. Do not ignore, and indeed you should not ignore the evidence that has come in from this side of the table. Would you permit a jury to decide the question of whether this was in fact a conspiracy? It is my firm conviction that in the state of this record, as it exists today with only three days of discovery, the record would require Your Honor to submit the question of conspiracy to a jury.

"If we are charged, Your Honor, with playing frivolous games, and we are so charged, the necessary conclusion that they must also urge is that this court himself has been a willing participant in that frivolous game, and why? Surely, if our case was built on sham, it wouldn't have taken this court three weeks to find it out. And if our case was so weak and so spurious and so unfounded, this court would have cut this hearing short ten days ago and would have granted them a motion to dismiss the case.

"The court did not do that, and the court was right in not doing it. But, when the court decided to hear all of the evidence, the court was also, it seems to me, branding as incorrect the charge that this is frivolous and that this is a sham. That can't be so.

"Let's take for the moment Article 1527, about which obviously we are in sharp disagreement. It must be claimed by these lawyers, and they have so claimed it, that our 1527 is so clearly inapplicable that it doesn't even raise a serious question. I want you to look for just a moment, if you please, as to what happened on this hearing. I want you to examine the claim of a lawyer-client privilege. I am not quarreling with Your Honor's ruling. I happen to think it was right. There are some privileges, for example, that fifth amendment privilege so constitutionally sacred that no one is allowed to comment upon or even draw inferences in claim of that privilege. Such is not the case with the lawyer-client privilege.

"Why? It's a fair question, we think. Did not these lawyers waive the claim? Why did they not bring before Your Honor their legal opinions that were written prior to the making of this tender offer? It is certain they had such an opinion. If that legal opinion demonstrated, written before any lawsuit was ever filed, demonstrated that there was no serious question, don't you know that they would have waived the privilege and presented to you that legal problem? But what did they do?

"MR. HUTCHESON: Excuse me, Your Honor.

"THE COURT: We don't have a jury.

"MR. HUTCHESON: Sir?

"THE COURT: We don't have a jury here.

"MR. HUTCHESON: At the proper time, I would like to reply.

"THE COURT: Sir?

"MR. HUTCHESON: I simply—I'm sorry I interrupted Mr. Phillips. I first make that apology, but I believe from what he is now doing, he is attempting to argue the presumed contents of opinions, and I believe that's clearly outside of the evidence of the case, and I wanted to respectfully object to it.

"THE COURT: Thank you.

"MR. PHILLIPS: I have not gone outside of the record, Your Honor, but I'll leave that to you.

"What did counsel do? They brought here for two days Professor Lebowitz who teaches corporation law at the University of Texas, had him right here in this courtroom. Finally they got from him an affidavit. They now ask Your Honor, if I understood Mr. Hutcheson correctly, that you must see that or may consider it even though you excluded it.

"What you did, Your Honor, was to invite these lawyers to put the professor on the witness stand because you can't cross-examine an affidavit, but if they had put Professor Lebowitz on the witness stand, the court could have asked the professor some questions about 1527, and so could we.

"And is there any conclusion to be drawn that they found it to their best interest not to accept your invitation and not to put

him on the witness stand? And in the light of that record, can they now convince you there is no serious question with regard to the application of 1527?

"Let's look at the conflict of interest. This has occupied a goodly portion of the Court's time. Let's go first to a few basic facts.

"Our system of free enterprise, as I understand it, has been brought on in large part upon private corporate endeavors. Our government cannot control or buy the ownership of a Texas corporation. Witness a few years ago our Supreme Court striking down, even though there was then said to be a national emergency, the act of President Truman in seizing control of a private corporation steel mill. Any person, whether he be black or white, or whether he be an alien or American, has a right to become a stockholder in an American corporation. And he does so for one purpose. He does so in order to provide himself with an opportunity, sometimes unwisely, to make a profit on his investment. The director who sits on the board of directors owes to that stockholder and to every stockholder the unquestioned loyalty of acting in his best interest. That's one side of the coin.

"Let's look at the other side. The take-over attempt to which this court is here concerned is a direct intervention in the affairs of a domestic corporation by an arm of the Canadian Government. It seeks control of that corporation. And we say, Your Honor, that this presents an inherent, inevitable conflict of interest. This is simply something because any objective and fair reading of the CDC act shows a clear mandate to give priority to the development and the utilization of Canadian natural resources.

"One of the highlights of this hearing, Your Honor, came, at least for me, in a colloquy question that you engaged in with one of the witnesses. I must be honest and tell you I don't remember exactly the context, and I'm certainly not trying to interpret the Court's remarks, but I'll never forget them. The Court said to one of the witnesses, as I understood it, in substance, that governments are transitory while nations are not. And how true that is. And the government of Canada is transitory and the board of directors of CDC is transitory. The only thing constant, Your Honor, is that every government and every succeeding government always claims that it is acting in the best interest of its citizens

"Let me come quickly to the point though. It is completely obvious, however well meaning Mr. Hampson, Mr. Crowe were in their statements of their intentions, however honest they were they can no more bind the government of Canada or the next board of CDC directors than I can. The protestations that they make that will act in the best interest of

all stockholders, we won't favor Canadian natural resources, are meaningless because a fair interpretation of that fact or an interpretation that can be taken by the next Canadian government can be to the opposite, and the point is demonstrated by the fact that while Mr. Hampson was testifying just a few days ago on July 25th, a spokesman in the House of Parliament, speaking on behalf of the acting Prime Minister, said that this acquisition is to promote the development of what? Canadian natural resources.

"Let me come to the balance of the equities. Mr. Hutcheson says that our arithmetic is bad when we claim to protect the holders of 20 million shares of Texasgulf stock, and maybe he's right. Maybe he's right, but he wants to knock off out of that 20 million shares those held by Canadians. Well, that gets us down, I guess, somewhere in the neighborhood of 50 percent, and we take, we ask, we have misgivings of about standing here and asking this Court to protect 15 million shares of Texasgulf stock half of the stockholders. It is said, and he's right, that occasionally, perhaps more often than not, the grant of a preliminary injunction kills a tender offer. That's true where you have private financing, that's true where the average private company who makes a tender offer can't keep its money tied up. But, surely, it must be clear to Your Honor that here we are not dealing with such an entity. Imagine a company that can get the largest loan in the history of the bank, $160 million, get it in a matter of two or three days and not even tell che bank what it's going to use the money for. That's the government, and I dare say, if I were running that bank under the supervision of the Canadian government, I would let them have $160 or $200 million, if they wanted it, and they will have no trouble, if this court holds this matter in abeyance, by making another tender offer at a later date when and after this court has resolved if it ever does, the serious questions that favor CDC, but what happens on the other side?

"Mr. Harvin started this case with a statement that this is a case of international significance. It's an awesome responsibility that you must bear. The consequences of what you do or what you don't do here are so far reaching that I can't perceive them in their entirety, and I doubt if this Court can either. All that we are asking in the final analysis is the right to have a fair and a full trial on the merits. Your Honor gave us accelerated discovery for which we are most grateful. We had only three days of discovery. Are we to be stopped there? It would be like stopping the investigation of Watergate after the seven first defendants were convicted.

"If this preliminary injunction is not granted, we may never have a trial on the merits.

The Texasgulf management immediately marshalled their forces for the impending struggle. The first skirmishes were fought in press releases appealing to the good sense of the common shareholder, along with the filing of this lawsuit in Houston, Texas, the issuing of a Temporary Restraining Order by this Court, and the use of expedited discovery by both parties.

The first engagement, the face to face confrontation in the courtroom, has now been concluded. It is fair to say at this stage that before a final victory is secured there will be other battles. To better understand this struggle for the control of Texasgulf, one must look to the events leading up to this lawsuit.

Simply stated, this suit arises out of a cash tender offer[3] made by Defendant CDC to purchase 10,000,000 of the approximately 30,385,000 outstanding shares of Plaintiff Texasgulf's common stock. The Plaintiff, Texasgulf, is a Texas corporation whose stock is registered with the Securities and Exchange Commission and listed on the New York, Toronto, Boston, Cincinnati, Detroit, Midwest and Pacific Coast Stock Exchanges. It is a multinational, natural resource company which as indicated by Article II of the company's Restated Articles of Incorporation engages in the production and marketing of metals, potash, sulphur, fertilizers, oil and gas, forest products and various other materials. Among the countries where Texasgulf has substantial assets and operations are the United States, Canada, Australia and Mexico. Texasgulf's assets exceed $700,000,000; its sales exceed $300,000,000 annually, and it has more than 80,000 shareholders.

CDC is a corporation incorporated by an Act of Parliament of Canada in 1971[4] and at the present all of its outstanding common shares are beneficially owned by the Government of Canada. It is the intention of the Act of the Canadian Parliament and of the Directors of CDC that up to 90% of the voting shares of CDC ultimately be held by Canadian citizens and residents.[5] The principal objects of CDC, as evidenced by the statute creating it, are:

"A) To assist in the creation or development of businesses, resources, properties and industries of Canada;

B) To expand, widen and develop opportunities for Canadians to participate in the economic development of Canada through the application of their skills and capital;

C) To invest in the shares of securities of any corporation owning property or carrying on business related to the economic interests of Canada; and

I am not talking scare talk, I am talking practicality of the most realistic kind. In the evidence here, there is a plan that if this tender offer is consummated, a special meeting of the stockholders can be held. As Your Honor realized that not only can that stockholders' meeting be held, but that each and every one of the eleven directors can be voted out of office and an entirely new slate put in, and then this case dismissed, but even if it's not dismissed, suppose just one, just one of these serious questions are resolved against Mr. Hutcheson's contentions, then they will suffer the irreparable injury, if not by the holders, Mr. Hutcheson, of 20 million shares, certainly by the holders of 15 million shares. They are entitled to be protected, Your Honor.

"Denial of this right to Texasgulf, in my opinion, is not only the denial of Texasgulf, not only a holding by Your Honor that we have engaged in frivolous and sham tactics, but it also comes down to a holding that Texasgulf will not even have the right, under procedures fair to both sides, to investigate the truth and to ask this Court at a subsequent date to resolve these issues in a deliberate, in a careful and in a manner that is inherently traditional to the fair place that is invited in our judicial system of government.

"We ask that the preliminary injunction be granted.

"THE COURT: Thank you very much, Mr. Phillips."

3. See Appendix A.

4. Statutes of Canada, 19–20 Elizabeth II, C. 49.

5. *Id.* § 36.

D) To invest in ventures or enterprises, including the acquisition of property likely to benefit Canada;

The statute further states that these objects "shall be carried out in anticipation of profit and in the best interests of the shareholders as a whole."

The final events of the attempted acquisition of Texasgulf by CDC occurred in a brief period of time beginning on Monday, July 23, 1973 when the Executive Committee of the CDC, meeting in Toronto, Ontario, Canada determined to recommend to the Board of Directors of CDC the tender offer plan to acquire shares of Texasgulf. Mr. Gene M. Woodfin of Loeb, Rhoades & Co., the dealer-manager for the offer, notified his office to prepare the necessary papers. He also called the office of Mr. Claude O. Stephens, Chairman of the Board of Texasgulf, to request an appointment for the next day, July 24, 1973, and was told by Stephens' office that Stephens would be able to see him at 4:00 P.M. on that day.

On the next morning, the Board of Directors of CDC met in Fredericton, New Brunswick and approved the tender offer. Woodfin and the executives of CDC flew immediately to New York. There they were met at the airport by representatives from Loeb, Rhoades & Co. with the tender offer documents. These were immediately executed and the representatives flew on to Washington to make the necessary filing with the Securities and Exchange Commission (SEC).

That same day, July 24, 1973, at approximately 4:40 P.M., Eastern Daylight Time, CDC filed with the SEC a Schedule 13D statement in compliance with Section 14(d) of the Securities and Exchange Act, 15 U.S.C. § 78n(d),[6] de-

---

6. This section provides in pertinent part:

"(1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78-1 of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78-1(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders.

(2) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for purposes of this subsection.

(3) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

(4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission

scribing its tender offer to acquire 10,000,000 shares of Texasgulf common stock at a price of $29.00 (U.S.) per share, and at approximately 5:30 P.M. (EDT) issued a press release for publication on July 25 announcing the tender offer. The President of CDC, Mr. H. Anthony Hampson, the Chairman of the Board of CDC, Mr. Marshal A. Crowe, and Mr. Gene M. Woodfin, in person, advised the President of Texasgulf, Dr. Charles F. Fogarty, and Mr. Charles O. Stephens of CDC's decision to make the tender offer at the previously arranged meeting in Stephens' office at approximately 4:05 P.M. (EDT) on July 24, 1973.

Texasgulf immediately summoned the members of its Board of Directors to the Company's New York offices to determine what action the Company should take. At the same time, Mr. David M. Crawford, the Corporate Secretary of Texasgulf, began to respond to inquiries from various press and other sources by stating that news of the tender offer had been a "bomb-shell" and "had come as a complete surprise."[7]

On July 25, 1973, Texasgulf issued a press release stating that its Board would meet later that day to study carefully all aspects of the tender offer.[8] Furthermore, throughout the course of that day, Crawford, rather than advising the shareholders who telephoned the company for advice that the company had not yet reached a decision, instructed the shareholders not to be "hasty" in their decision to tender and instead to act "prudently."

The meeting of the Board of Texasgulf held on the evening of July 25, 1973, was, according to the minutes, "convened to consider the best course of action for the company to follow." From the evidence it is apparent that no one at the meeting spoke in favor of the offer and most of the discussion centered around objections to it. According to one of the Directors present, the Directors did not at the July 25 Board meeting, or at any subsequent Board meeting, take exception to the adequacy of the price proffered by CDC nor did they raise any legal objections to the adequacy of the offer. The general consensus of the meeting was that they needed to "stop the clock" to give them time to investigate the deal.

To this end, they determined that any legal proceedings by the corporation should be taken in Texas because the company was incorporated there, had major assets in Texas, substantial shareholdings and shareholders in Texas. At this Board meeting the Directors instructed management to get in touch with Tom Phillips, Esq., a Director and an attorney for Texasgulf, and to write him a blank check, including authority to institute legal proceedings if he found grounds to do so and by all means to stop the clock.

That decision to "stop the clock" was never reflected in the Board minutes of the July 25, 1973 Texasgulf meeting or at any subsequent meetings. Neither was a filing made pursuant to Section 14(d) of the Securities and Exchange Act with the SEC disclosing any such decision, nor were the shareholders so advised. Instead, from July 25 until this suit was filed, the shareholder public was allowed to continue to believe that the management of Texasgulf had either taken no position with respect to the tender offer or had not yet decided what to do. Throughout that time the public

---

may prescribe as necessary or appropriate in the public interest or for the protection of investors . . . "

7. Record at 1792.

8. The press release reads as follows:
"NEW YORK, July 25—Texasgulf Inc. stated that its board of directors would meet later today to carefully study all aspects of the tender offer of Canada Development Corporation, which is 100 per cent owned by the Canadian Government.
"Texasgulf stated that its regular Quarterly Report to Stockholders, commenting in detail on operations during the first half of 1973, is at the printers and mailing will begin tomorrow."

bought and sold the stock of Texasgulf necessarily relying upon that studied silence of management.

As late as 3:59 P.M., EDT, on July 27, 1973 with trading still in progress on the Pacific Coast Stock Exchange, the Dow-Jones broad tape carried the report that management of Texasgulf, while having now reached a decision, still would not announce it. No mention was made of the decision two days earlier by management to give their attorney carte blanche to do whatever they could to stop the progress of the tender. The evidence reflects that the Board of Directors of Texasgulf has not met since July 26, 1973.

Late in the afternoon of Friday, July 27, 1973 Texasgulf filed in this Court a Complaint seeking a permanent injunction, a temporary restraining order and a date for an evidentiary hearing for a preliminary injunction. Texasgulf requested that the Court enjoin CDC from proceeding with and consummating the tender offer and enjoin CDC from engaging in any other illegal acts aimed at consummation of the tender offer or the acquisition of effective control of Texasgulf.

The Original Complaint alleged that CDC's tender offer violated Section 14(e) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78n(d) and 78n(e), 1970, commonly called the Williams Act, in that it failed to disclose:

1. The possibility that consummation of this tender offer would place Texasgulf in violation of Tex. Civ.Stat.Annot. Art. 1527 (1962), and the consequences which could flow from such a violation.

2. The purpose for which CDC was organized and the resulting conflicts between its interests as controlling stockholder of Texasgulf and those of the stockholders who are not Canadian residents.

3. CDC's plans and proposals with respect to changes in Texasgulf particularly as to management and possible spin-off of assets.

The Complaint also alleged that the tender offer is discriminatory and contrary to the policies underlying Section 14(e), in that the offer is not open to Canadian residents.

On the same day the Complaint was filed, after hearing counsel in chambers, the Court granted the temporary restraining order [9] and further granted Texasgulf's motion for a preliminary injunction hearing for Monday, August 6, 1973 at 2:00 P. M. and ordered the filing of briefs and proposed findings by both parties.

On Monday, July 30, 1973 CDC filed its original answer and counterclaim for injunctive relief charging Texasgulf with violations of Section 10(b) and 14(e) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78n(e), and of its fiduciary duty to its shareholders to advise them of the company's position with respect to the tender offer. The Court directed that

9. Temporary Restraining Order of July 27, 1973. "Plaintiff's application for a temporary restraining order came on for hearing on July 27, 1973, and it clearly appearing from the specific facts shown in the verified application and complaint that immediate and irreparable injury, loss and damage would result to the applicant before defendant could be heard in opposition, and plaintiff's attorneys having certified in writing that the defendant is a Canadian corporation which is not present within the Southern District of Texas so that notice could not be given to it locally; it is hereby ORDERED AND DECREED that Canada Development Corporation is restrained from continuing with and consummating its tender offer for the common stock of Texasgulf Inc. This order is binding upon Canada Development Corporation, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with Canada Development Corporation in the making of said tender offer.

"It is further ORDERED that this temporary restraining order shall continue in effect for ten days.

"It is further ORDERED that there shall be a hearing on the application for temporary injunction on August 6, 1973 at 2:00 P.M. o'clock in the United States District Court for the Southern District of Texas in Houston.

"ENTERED this 27th day of July, 1973 at 5:05 P.M."

CDC's counterclaim would also be heard on August 6. CDC also made a motion to modify Plaintiff's Temporary Restraining Order to allow depositories to continue to receive and hold, subject to the terms of the tender, any shares or tenders proffered to them, provided that those shares would be held pending further order of the Court. The Court granted this motion and the Temporary Restraining Order was modified.[10] The Court also granted CDC's motion for accelerated discovery.

Then on Monday, August 6, 1973, one and one-half hours prior to the commencement of the hearing on Texasgulf's request for a preliminary injunction, Texasgulf filed a motion for leave to file an amended complaint. In this proposed amended complaint, Texasgulf alleged more information which it felt was material and should have been disclosed by CDC in its tender offer. In addition Texasgulf radically altered the nature of this case by alleging that there were sufficient grounds for the issuance of a preliminary injunction independent and apart from the disclosure problem. The Court, in light of the motion for leave to file the amended complaint, and CDC's vigorous opposition to the motion, reset the case for one day in order to give counsel sufficient time to prepare arguments.

The new matters alleged in the First Amended Complaint are as follows:

1. CDC and Noranda Mines Limited, a Canadian mining and manufacturing corporation, along with others unknown, secretly and fraudulently entered into a plan, combination and conspiracy to acquire shares of Texasgulf with the aim of obtaining control by the use of illegal, improper, secretive, and fraudulent acts and practices. This conspiracy is in violation of Section 14(e) of the Exchange Act, Section 13(d) of the Exchange Act, which requires a group holding in excess of 5% of the outstanding shares of an issuer to file a Schedule 13D which must contain information with respect to each member of the group, and Section 14(d) of the Exchange Act which requires a group that commences a tender offer to file a Schedule 13D containing full information with respect to each member of the group.

2. Acquisition of a controlling interest by CDC would violate Section 1 of the Sherman Act and § 7 of the Clayton Act.

3. Upon consummation of the tender offer Texasgulf would cease to be eligible for the insurance, finance, and various other programs afforded with respect to investments in certain less developed countries by the Overseas Private Investment Corporation (OPIC).

4. Consummation of the tender offer would jeopardize a host of radio licenses held by Texasgulf.

5. Control of Texasgulf by CDC would jeopardize Texasgulf's Australian mining ventures.

In its First Amended Complaint Texasgulf is urging that all of these matters, including those set forth in the Original Complaint, should have been disclosed by CDC. In addition, Texas-

10. Order Modifying Temporary Restraining Order of July 27, 1973. "It is therefore ORDERED AND DECREED that Canada Development Corporation, its officers, agents, servants, employees and any person or entity acting for or in behalf of and in any way at the behest of Canada Development Corporation in its tender offer for the common stock of Texasgulf Inc. is restrained from soliciting in any way any tenders and from consummating its tender offer for the common stock of Texasgulf Inc., except that the depositories shall have the right to continue to receive and hold, subject to the terms of the tender, any shares or tenders proffered to them, provided that such shares or tenders shall be held pending further order of the Court.

"It is further ORDERED that this temporary restraining order shall replace the Temporary Restraining Order entered herein on July 27, 1973 and shall continue in effect until Monday, August 6, 1973, at 2:00 P.M.

"ENTERED this 30th day of July, 1973 at Houston, Texas at 11:00 A.M."

gulf contends that the "Conspiracy," "Antitrust," "Article 1527," and "Conflict of Interest" matters are sufficient grounds for the issuance of a preliminary injunction independent of any disclosure issue.

Texasgulf also brought several new parties into the suit as Defendants and co-conspirators with CDC. These included Noranda Mines, Limited, a Canadian corporation engaged in mining manufacturing; Marshal A. Crowe, Chairman of the Board of CDC; H. Anthony Hampson, President and Chief Executive Officer of CDC; J. Douglas Streit, President of Yellowknife Bear Mines, Limited, a Canadian corporation; Alfred Powis, President and Chief Executive Officer of Noranda; and E. Kendall Cork, Vice-President and Treasurer of Noranda. All of the named individuals are residents and citizens of Canada, and at the time of this hearing service has been completed only as to Mr. Crowe and Mr. Hampson, in addition to CDC, with the result that the rest of the parties are not before the Court at this time.

On August 7, 1973 after a hearing was held in chambers, the Court granted leave for the Amended Complaint to be filed. The Court also entered a Temporary Restraining Order enjoining Texasgulf from communication with the stockholders of Texasgulf with respect to the tender offer and this action other than in open court.[11] The Court began hearing evidence in this case on Wednesday, August 8, 1973.

On August 9, 1973, CDC filed a motion to dismiss Texasgulf's First Amended Original Complaint against individual Defendants Hampson and Crowe as provided by Rule 12, F.R.Civ. P. The Court determined to carry that motion along with the case.

On August 10, 1973 at a conference in chambers prior to the resumption of the hearing the Court signed an Order allowing the CDC to extend the tender offer for one week, and to make a press release, the wording of which was approved by the Court, announcing the extension.[12]

11. Temporary Restraining Order of August 8, 1973. "Defendant's application for a Temporary Restraining Order against Plaintiff having come on for hearing on August 6, 1973, and it clearly appearing from the specific facts shown in the verified application and in the counter-claim alleged in the original answer of Defendant that immediate irreparable injury, loss and damage would result to the applicant through various steps to frustrate and defeat the Defendant's pending tender offer for shares of Plaintiff, unless Plaintiff is restrained from such activity while Defendant is under restraint, and, after hearing counsel for the parties and good cause therefor having been shown, it is hereby

"ORDERED that, pending further order of the Court, Plaintiff, its officers, agents, attorneys or employees are temporarily enjoined and restrained, for a period of ten days from August 7, 1973 or until further order of the Court, from communicating with shareholders of Plaintiff with respect to the subject matter of this action, other than in open court, or from in any way acting, directly or in concert with others, to disturb the status quo, with respect to the pending tender offer from Canada. Development Corporation to acquire shares of Texasgulf Inc. or the subject matter

of this action, other than in connection with the legal prosecution or defense of this action.

"ENTERED this 8th day of August, 1973 at 5 P.M. o'clock P.M. effective as of August 7, 1973 at 4:30 P.M."

12. Order and press release of August 10, 1973. "Upon the application of Defendant, and after hearing counsel for the parties and good cause therefor having been shown, it is

"ORDERED that Defendant, Canada Development Corporation be and it hereby is permitted to extend to August 17, 1973 (subject to a right to further extend) its offer to purchase shares of Common Stock of Texasgulf Inc. at a net cash price of $29 (U.S.) per share, that Defendant is permitted to issue or cause to be issued the Press Release, a copy of which is annexed hereto as Exhibit 1, that Defendant Canada Development Corporation is permitted to advise the Depositary, Schroder Trust Company, of Defendant's said extension of said offer and that Defendant Canada Development Corporation is further permitted to make such filings with the Securities and Exchange Commission and with such other persons or entities as are necessary under law in order to effectuate said extension.

A second one-week extension of the tender offer was approved by the Court on August 17, 1973 and the Court granted CDC permission to make a press release announcing it.[13]

On August 20, 1973 CDC asked permission of the Court to issue a press release announcing the number of shares tendered as of 5:00 P.M. EDT, Friday, August 17, 1973. The Court granted

"ENTERED this 10th day of August, 1973, at 10:00 A.M. o'clock A.M."

"FOR RELEASE AUGUST 10, 1973

"Canada Development Corporation announced today that it has extended to 5:00 P.M. New York time, August 17, 1973 (subject to a right to further extend) its offer to purchase shares of Common Stock of Texasgulf Inc. at a net cash price of $20 (U.S.) per share. The offer was originally scheduled to expire at 5:00 P.M. New York time today, August 10, 1973.

"The offer is subject to a temporary restraining order entered by the United States District Court For the Southern District of Texas, Houston Division, which presently enjoins CDC from soliciting in any way any tenders and from consummating the offer pending a court hearing on a motion by Texasgulf for a preliminary injunction, which motion is presently being considered by the Court. Although the temporary restraining order permits the Depositary to continue to receive and hold deposits of shares of Texasgulf tendered pending further order of the Court, CDC, its officers, agents, servants, employees and any person or entity acting for or in behalf of and in any way at the behest of CDC in the offer may not solicit tenders and CDC may not make payment for shares tendered pending the Court's decision on the motion for preliminary injunction.

"CDC stated that if the preliminary injunction is not issued by the Court or if the Court modifies the temporary restraining order to permit solicitation of tenders pending the decision of the Court on the motion for preliminary injunction, certain new or additional information might be incorporated in an amended and extended offer which would be promptly published by CDC. Such new or additional information cannot be determined at the present time.

"Owners of shares tendered before or after August 10, 1973 and prior to publication of such amended and extended offer will be afforded an opportunity to withdraw such shares for a period following such publication. In the event that the Court permits, payment for shares tendered up to 10,000,000 on or prior to August 10, 1973 will be made as promptly as practicable after the close of any such withdrawal period.

"In the event that more than 10,000,000 shares are tendered prior to 5:00 P.M. New York time on August 10, 1973, CDC will purchase at least 10,000,000 shares and may elect to purchase all or part of the shares

tendered in excess of 10,000,000 shares; if CDC elects to purchase less than all of such excess, all shares purchased will be purchased on a pro rata basis. In the event that less than 10,000,000 shares are tendered prior to 5:00 P.M. New York time on August 10, 1973, the difference between the number tendered prior to 5:00 P.M. New York time on August 10, 1973 and 10,000,000 shares will be purchased if tendered prior to 5:00 P.M. New York time on August 17, 1973. If the shares tendered during the extension period exceed such difference CDC will purchase at least the number of shares equal to such difference and may elect to purchase all or part of the shares in excess of such difference; if CDC elects to purchase less than all of such shares tendered in excess of such difference all shares purchased will be on a pro rata basis among the shares tendered during such extension period. Appropriate adjustments will be made to avoid the purchase of fractional interests.

"If the offer is again extended, CDC will purchase shares tendered during any such further extension on a first-come, first-served basis, unless otherwise announced at the time of such further extension."

13. Order and Press Release of August 17, 1973. "Upon the application of Defendant Canada Development Corporation and after hearing counsel for the parties and good cause therefor having been shown, it is

"ORDERED that Defendant Canada Development Corporation be and it is hereby permitted to extend to August 24, 1973 (subject to a right to further extend) its offer to purchase shares of common stock of Texasgulf Inc. at a net cash price of $29 (U.S.) per share, that Defendant is permitted to issue or cause to be issued the Press Release, a copy of which is annexed hereto as Exhibit 1, that Defendant Canada Development Corporation is permitted to advise the Depositary, Schroder Trust Company, of Defendant's said extension of said offer and that Defendant Canada Development Corporation is further permitted to make such filing with the Securities and Exchange Commission and with such other persons or entities as are necessary under law in order to effectuate said extension.

"ENTERED this 17 day of August, 1973 at 10:00 o'clock, A.M."

"FOR RELEASE AUGUST 17, 1973

"Canada Development Corporation (CDC) announced today (8/17) that it has extended

CDC's request and ordered that both sides draft a release. The release, agreed to as to form by Texasgulf, was made the following day.[14]

A third one-week extension of the tender offer was approved by the Court on Friday, August 24, 1973 and the Court

granted CDC permission to make a press release announcing it.

At the end of the evidentiary hearing on August 23, 1973, the Court ordered final briefs and oral arguments on Monday, August 27, 1973, (one month from the day of the filing of the suit), and

to 5:00 p. m., New York time, August 24, 1973 (subject to a right to further extend) its offer to purchase shares of common stock of Texasgulf Inc. at a net cash price of $29 (U.S.) per share. The offer had previously been extended to 5:00 p. m., New York time, today, August 17, 1973.

"As previously announced, consummation of the offer is presently prohibited by a temporary restraining order entered by the United States District Court for the Southern District of Texas, Houston Division. A hearing on Texasgulf's motion for preliminary injunctive relief is still in progress before the Court.

"Subject to the outcome of such litigation and the other provisions of the Offer to Purchase, all shares tendered prior to 5:00 p. m. today up to 10,000,000 shares will be purchased. If more than 10,000,000 shares (including shares tendered during the initial offering period which expired on August 10, 1973) are validly tendered prior to 5:00 p. m. today, CDC will purcahse at least 10,000,000 shares and may elect to purchase all or part of the shares tendered in excess of 10,000,000; in the event CDC elects to purchase less than all of the shares tendered in excess of 10,000,000, all shares which were validly tendered on or prior to August 10, 1973, will be purchased and the balance of the shares purchased will be allocated on a pro rata basis among sellers who tendered their shares after August 10, 1973, and prior to 5:00 p. m., New York time on August 17, 1973.

"If less than 10,000,000 shares are tendered prior to 5:00 p. m., New York time, on August 17, 1973, but more than 10,000,000 shares are validly tendered on or prior to August 24, 1973, CDC will purchase at least 10,000,000 shares and may elect to purchase all or part of the shares tendered in excess of 10,000,000; if CDC elects to purchase less than all of the shares tendered in excess of 10,000,000, all shares tendered prior to 5:00 p. m., New York time, on August 17, 1973, will be allocated on a pro rata basis among sellers tendering their shares after August 17, 1973, and prior to 5:00 p. m., New York time, on August 24, 1973.

"Appropriate adjustments will be made to avoid the purchase of fractional interests. If the offer is again extended, CDC will purchase shares tendered during any such further extension on a first-come, first-served basis, unless otherwise announced at the time of such further extension.

"As previously announced, CDC stated that if the preliminary injunction is not issued by the Court or if the Court modifies the temporary restraining order to permit solicitation of tenders pending the decision of the Court on the motion for preliminary injunction, certain new or additional information might be incorporated in an amended offer which would be promptly published by CDC. Such new or additional information cannot be determined at the present time. Owners of shares tendered prior to publication of such amended offer will be afforded an opportunity to withdraw such shares for a period following such publication. Shares tendered, unless theretofore purchased by CDC, may also be withdrawn at any time after September 23, 1973."

14. Order and Press Release of August 20, 1973. "Upon the application of Defendant, and after hearing counsel for the parties and good cause therefor having been shown, it is

"ORDERED that Defendant Canada Development Corporation be and it hereby is permitted to make the appropriate filings with the Securities and Exchange Commission and all other necessary entities and persons and thereafter to issue or cause to be issued the Press Release, a copy of which is annexed hereto as Exhibit 1.

"ENTERED this 21st day of August, 1973 at 21st (sic) o'clock 10 A.M."

"FOR RELEASE AUGUST 21, 1973

"Pursuant to Court order Canada Development Corporation announced today (8/21) that approximately 7,815,250 shares of common stock of Texasgulf Inc. had been tendered on or prior to August 17, 1973, in response to the offer (now expiring on August 24, 1973) of Canada Development Corporation to purchase shares of common stock of Texasgulf Inc.

"As previously announced, consummation of the offer is presently prohibited by a temporary restraining order entered by the United States District Court for the Southern District of Texas, Houston Division. A hearing on Texasgulf's motion for preliminary injunctive relief is still in progress before the Court."

Texasgulf filed its final findings of fact and conclusions of law on August 30, 1973.

With respect to determining which parties are before the Court, the Plaintiff advised the Court in chambers on Thursday, August 16, 1973 that service had been made on Defendants Noranda Mines, Limited, J. Douglas Streit, Alfred Powis and E. Kendall Cork by service on the Secretary of State of the State of Texas pursuant to Article 2031(b) of the Texas Statutes. Because none of these parties have answered, and indeed the time in which they have to answer has not yet expired, the Court finds that the parties who are presently before it and who will be bound by whatever relief it determines to be at this time appropriate are Texasgulf, Inc., Canada Development Corporation, H. Anthony Hampson, and Marshal A. Crowe.

It appears to the Court that the thrust of Texasgulf's case is twofold. Texasgulf contends that the Schedule 13D statement filed with the SEC and its soliciting materials were false and misleading, contained untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made under the circumstances in which they were made not misleading in violation of the Securities and Exchange Act of 1934, §§ 14(d) and 14(e), 15 U.S.C. §§ 78n(d) and 78n(e), in the following respects:

1. Nature and identity of the group acting in concert.

2. Violations of federal antitrust laws that would result from successful consummation of CDC's tender offer.

3. Violation of Article 1527, Tex. Rev.Civ.Stat.Annot. which would result from consummation of the tender offer and which would threaten the continued existence of Texasgulf.

4. The inherent conflict of interest which would result from CDC's acquisition of Texasgulf.

5. Plans and proposals of CDC to dispose of assets and to make major changes in the business and management of Texasgulf once it acquires control.

6. Adverse effect that CDC's acquisition of control of Texasgulf would have on Texasgulf's Australian operation.

7. Loss of eligibility to participate in Overseas Private Investment Corporation, 22 U.S.C. §§ 2191, et seq., if CDC acquired control.

8. Violations of the Communications Act, 47 U.S.C. § 310, which would result from consummation of the tender offer.

Texasgulf further contends that more is involved in this case than just disclosure violations of the securities laws. It claims that many of the facts alleged not only should be disclosed but are themselves independent grounds for issuance of an injunction, specifically, conspiracy, antitrust violations, violation of Article 1527, and inherent conflict of interest.[15]

## THE ALLEGED CONSPIRACY

Texasgulf contends that a plan, combination and conspiracy existed between CDC, Noranda Mines and others to gain control of Texasgulf and that this constituted a course of conduct in violation of Sections 13(d) and 14(d) of the Securities and Exchange Act and of that portion of Section 14(e) of the Act which provides that "It shall be unlawful for any person . . . to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . ." Texasgulf further maintains that disclosure of such acts or practices does not cure the violations.

In order to understand the Texasgulf conspiracy allegations we have to look at

---

15. The allegation in Texasgulf's Original Complaint that the tender offer is contrary to Section 14(e) in that it excludes Canadian residents, does not appear in Texasgulf's First Amended Original Complaint. It is therefore no longer in this case.

the way it says this conspiracy develops. To begin with Texasgulf observes that Noranda is a natural partner for CDC to have in seeking control of Texasgulf because should they be successful CDC would need the expertise that Noranda possesses in the mining field to operate Texasgulf. Furthermore, Noranda already held substantial shares of Texasgulf stock that it had previously acquired. The Plaintiff contends that the conspiracy had its beginnings in discussions between Hampson, President of CDC, and Kendall Cork, Vice-President of Noranda, and one of the named individual defendants who is not presently before the Court. The first part of the agreement was that Noranda would obtain for CDC shares of Texasgulf stock in a street name and that they would give each other the first refusal on their shares if for some reason they determined not to go through with their plan. They also allegedly determined to enter into a joint tender offer for the stock of Texasgulf once they had acquired a basic position in Texasgulf, and that once they had effective control of the company they would spin off non-Canadian assets of Texasgulf in order to help finance the purchase of more mining properties with the view of concentrating on Canadian mining as the purpose of the company or in order to liquidate debts incurred in conjunction with the tender offer.

In furtherance of this plan, Texasgulf contends, Noranda proceeded to acquire Texasgulf stock from March of this year until mid-June when they realized that their joint holdings were very close to reaching the five percent point at which time they would have to make a filing with the SEC disclosing their holdings and the intentions that they had with respect to the stock of Texasgulf. So they stopped purchasing stock on the open market. About this same time the Plaintiffs allege one J. Douglas Streit, also a Defendant but not before the Court at this time, acting under the direction and control of Noranda attempted by false representation to the

Texasgulf management to obtain by a shareholder's list of Texasgulf shareholders. Texasgulf maintains that as the conspirators discussed the joint tender offer for Texasgulf, they came to the realization that if a prominent mining company such as Noranda was identified with the venture, they would probably have to pay more for the stock. So they embarked upon a plan to conceal Noranda's involvement by determining that the offer would be made in the name of CDC only, and to this end they constructed a record of correspondence beginning with a letter dated July 4, 1973 which indicated that the two companies had severed all relationships and had no further joint plans with respect to Texasgulf.

Now as to this alleged conspiracy the Court is convinced that the credible and competent evidence shows the facts are substantially as follows:

CDC first began considering the possibility of investing in a company engaged in mining or natural resources in February or March of 1972. While the directors did at first consider the possibility of entering *de novo* they quickly concluded that CDC could enter the field only by an acquisition since, *inter alia*, profitable mining properties do not simply materialize, and neither did CDC and its sixteen employees have the requisite mining expertise. A list of some thirty companies was prepared for comments of the directors. At that time, CDC's Board had in mind an investment that would be in the range of fifty to seventy-five million dollars. Although Texasgulf was listed among the companies for identification purposes, it was not at that time considered a likely company for investment because of the financial range for investment set by the Board, and because other companies then under consideration appeared to be more logical. CDC proceeded with discussions with the controlling stockholders of the other companies under consideration. By October of 1972, these possibilities had been exhausted and once again Texasgulf came back into consideration with

several other companies in which such an investment possibility might exist. However, again it was shelved for the reasons it had been in March of 1972.

In March of 1973, Texasgulf once again came to the forefront in the considerations of the CDC Directors. At the March 27, 1973 meeting of the CDC Board, Hampson presented to the Board a somewhat hastily prepared memorandum based upon information then at his disposal, concerning a number of possibilities for investment in the mining field. Among the companies then discussed was Texasgulf. The information in the memorandum with respect to Texasgulf was based both on publicly available data and on information obtained during the immediately preceding few days from officials of Noranda Mines, Ltd.[16]

When CDC first became interested in the mining field, it talked to various people in the mining business to get an idea of what role CDC might take in investing in that field. Among those to whom CDC talked was the President of Noranda, Defendant Alfred Powis. Shortly before the March 27, 1973 CDC Board of Directors meeting, Hampson met with Powis to discuss these potential investments, and particularly, whether at a management level (as opposed to director's decisional level), Noranda would be interested in at least looking at Texasgulf with CDC. Powis indicated that Noranda had at that time significant shareholdings in Texasgulf and that at a "management level" Noranda would be prepared to look at the possibilities of a joint investment. While Powis indicated that he would of course have to think about such a venture further, Noranda's management representatives undertook, however, to furnish and did furnish to CDC, some information which had been compiled by Noranda concerning Texasgulf, and it was that information which served as the prime source for the data embodied in the Hampson report concerning Texasgulf which was considered at the March 27, 1973 meeting.

The general thrust of the March 27, 1973 memorandum to the Board was that CDC's management believed that CDC "would have very little to lose and much to gain in buying Texasgulf shares up to say 1,000,000 shares" because of its investment potential and ready marketability.[17] However, it was urged by management of CDC that no "major" purchasing program be undertaken "until a satisfactory joint venture has been agreed with Noranda and approved by the CDC Board." At the March 27 meeting, the CDC Board approved the purchase of stock in Texasgulf and one other mining company then under consideration in an amount of up to $10,000,000 each.

On April 2, 1973, CDC agreed with Noranda that Noranda would act as agent for CDC in the purchase of shares of Texasgulf on CDC's behalf and subject to CDC's instructions. They also agreed informally to give each other the right of first refusal should either decide to sell the Texasgulf stock they held.[18]

16. Plaintiff's Exhibit 4, Memorandum of March 21, 1973 to CDC Directors for Board meeting, March 27, 1973, P. 3:
"Noranda has not as yet decided to recommend this project to their Board but has been most cooperative in opening up their files to us. Not only has Noranda itself done extensive work, but it has employed outside consultants in connection with the non-base metal activities of Texasgulf."

17. Ibid. P. 4.

18. Plaintiff's Exhibit 6: Letter of April 2, 1973 from E. Kendall Cork, Vice-President and Treasurer of Noranda to Hampson:

"This will confirm our discussion this afternoon that for greater secrecy Noranda will continue to purchase shares on your behalf and subject to your instructions. Noranda will open an account at The Bank of Nova Scotia, Toronto Branch, for payment and safekeeping. From time to time CDC will advance funds to Noranda out of which payments will be made for shares purchased . . .

"If at any time CDC or Noranda decides to sell any shares of the subject company it will first advise the other . . . ."
Confirmed by letter of April 5, 1973 from Hampson to Cork.

Furthermore, Noranda agreed that during the time when it was purchasing Texasgulf stock on behalf of CDC under no circumstances would it purchase stock on its own behalf. The procedure utilized was that Noranda would instruct its stockbroker to purchase the shares through the vehicle of an "Account 5000" opened at the stockbroker's office and Noranda would then pay for the stock, CDC thereafter reimbursing Noranda for its actual expenses. No provision was made for any kind of fee for Noranda for acting as agent, but in light of the fact that both parties were at the time considering the possibility of a joint venture that does not seem unreasonable. Likewise the informal first refusal arrangement in the event either side determined to dispose of its stock is not irregular since each side at different levels was contemplating significant purchases of Texasgulf stock and the possibility of doing it together. CDC was very determined that its purchases of Texasgulf stock should be handled with the utmost secrecy since it was not yet prepared seriously to consider the making of any bid for control of Texasgulf. In addition, it did not want to broadcast that it was in the market and thereby increase the price of the stock, and it was also afraid that the public would draw an erroneous conclusion that, in light of CDC's general policy to make a significant investment only, that CDC had embarked upon such a program at a time when CDC had clearly not determined thus to proceed.

By the time of the next Board meeting of CDC, held May 22, 1973, CDC had acquired some 338,000 shares of Texasgulf stock in the open market. The Noranda management representative still had not determined whether to recommend to the Noranda Board to join with CDC as a "potential partner" in the purchase of a significant block of Texasgulf stock, but had already indicated that they were not interested in taking as significant a role therein as they had originally indicated they would, and promised to let CDC know by July what posture they would take.[19]

At the CDC Board of Directors meeting on May 22, 1973 two memorandums were presented to the Board concerning Texasgulf. One was prepared by a CDC staff member and reviewed by Hampson. It set forth favorable views concerning Texasgulf management and concluded "that Texasgulf had made a strong effort to become a diversified natural resource company during the last decade. Its success in doing so has been somewhat understated by the poor financial performance of the past several years which is, in a large measure, due to the cyclical nature of the company's markets rather than to internal company weaknesses."[20] The second memorandum was prepared by an analyst at the request of the management of CDC reflecting his opinions as to the operation of Texasgulf and concluding that there were some weaknesses in management.[21] This was an opinion with which Hampson disagreed, but which he felt should

19. Plaintiff's Exhibit 9: Memorandum of May 17, 1973 to CDC Directors for Board Meeting, May 22, 1973:
"Our potential partner [Noranda] is examining the role it might play in this venture and has promised us a decision in time for our July Board Meeting. Tentative preliminary indications at the level of its senior management are that it would be favorably disposed towards a 20% eventual participation in a company set up to hold control of Texasgulf . . . ."
Texasgulf has argued based on the fact that at several points in this particular memorandum Noranda is referred to as "our partner," CDC and Noranda had at this point already agreed to acquire Texasgulf together. How-

ever, throughout the bulk of this memorandum Noranda is referred to as "our potential partner" and it is apparent from the memorandum taken as a whole that no final agreement between Noranda and CDC had been made, and that in fact the proposed plan had not yet been presented to the Noranda Board of Directors.

20. Defendants' Exhibit 12: Memorandum of May 16, 1973 to CDC Directors for meeting of May 22, 1973, P. 5.

21. Plaintiff's Exhibit 10: Detailed Analysis of Texasgulf, P. 28:
"New management and a new operating philosophy would likely have to be imposed on

be before the Board nevertheless. CDC management recommended to the Board that the Board authorize additional purchases of Texasgulf stock of a size which "could ultimately be disposed of profitably if the Board decided not to proceed, while giving us a worthwhile start towards a successful tender off if that were the Board's decision in July." [22] The CDC Board gave that approval but *subject* to the limitation that not more than 5% of Texasgulf stock be purchased and subject to the further limitation that no action on a tender could be taken without both CDC Executive Committee action and the approval of the Board of Directors.[23]

On June 14, 1973 CDC, having at that time a total of 748,800 shares of Texasgulf, made its last purchases of stock and then determined that it should stay out of the market. That decision was made with a conscious view toward in- suring compliance with the requirements of the Securities Act, especially Section 13(d) [24] since at that time Noranda's management representatives still had not decided whether to recommend to Noranda's Board that Noranda should join with CDC in a venture encompassing the purchase of Texasgulf stock, and together, CDC and Noranda would, if they proceeded together, be approaching the 5% trigger of Section 13(d). At that point CDC held approximately 2½% of Texasgulf stock.

On June 27, 1973 Noranda's management representatives informed CDC that at the management level they were not prepared even to recommend any kind of joint venture with CDC in relation to Texasgulf to their Board in the light of a number of other projects, and that they wanted to be free to go their own way. That termination was reflected by

Texasgulf were the CDC to assume control. As mining is an industry with some Canadian competence, this problem could be overcome."

22. Plaintiff's Exhibit 9, supra.

23. Plaintiff's Exhibit 11: Resolution Adopted at Board of Directors of CDC Meeting, May 22, 1973:

"Upon motion made and seconded, it was resolved: That the management of the Corporation with the approval of the Executive Committee be and is hereby authorized to continue to purchase shares of the company referred to in the confidential memorandum filed with the records of this meeting and dated May 17th, 1973 [i. e. Texasgulf], up to 5% of the issued common shares of that company, and

"THAT when the studies undertaken by management are concluded, if approval of a tender offer is recommended by the Executive Committee of the Board before the next regular Board meeting, each director of the Board be circulated with a memorandum and be canvassed by telephone for approval."

24. Section 13(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78m(d)(1) provides in pertinent part:

"Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to Section 78*l* of this title . . . , is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office . . . , and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

"(A) the background and identity of all persons by whom or on whose behalf the purchases have been or are to be affected;

"(B) the source and amount of the funds . . . to be used in making the purchases . . .

"(C) if the purpose of the purchases or prospective purchases is to acquire control . . . , any plans or proposals which such persons may have to liquidate such issuer . . . or to make any other major change in its business or corporate structure;

"(D) the number of shares of such security which are beneficially owned . . .

"(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer . . .

"(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."

Noranda in its July 4, 1973 letter to CDC's President, Mr. Hampson.[25] This was followed by a letter of July 9, 1973 from the Assistant Treasurer or Noranda to Hampson which included the broker's contracts and indicated that the shares were to be held for CDC's account.[26] At the same time Noranda sent a letter to the Bank of Nova Scotia where the shares were deposited instructing them that the shares and any dividends were to be transferred to the account of CDC pending their further instructions.[27] On July 10, 1973 CDC confirmed receipt of Noranda's July 4 letter and the termination of the first refusal arrangement and all discussions with respect to Texasgulf.[28]

25. Plaintiff's Exhibit 6, Letter dated July 4, 1973 from Cork to Hampson:

"We talked on Thursday about our possible participation with you in acquiring a significant position in the U.S. based company. We are now of the view that Noranda is not prepared to participate, and there is no point in our raising the subject with the Noranda Board.

"As you know, our present investment, while sizeable in a sense, is nevertheless small in proportion to Noranda's total assets. It is simply a portfolio investment and it is our understanding that legally we can liquidate it without difficulty at the moment. However, we might well lose this freedom if we were to participate with you. We have other projects under consideration, some of which are major, and they have a higher priority than your project would have with us. Our present commercial relations with the subject company are quite cordial and we seen no reason to change them.

"For all these reasons we feel that we should not explore the matter further with you and should bring our discussions to an end. Obviously the informal first refusal arrangement between us would serve no further purpose and should now be abandoned.

"It was an interesting exploration and we enjoyed our discussions. Perhaps some other venture in the future might bear more fruit . . ."

26. Plaintiff's Exhibit 6, Letter dated July 9, 1973 from Bruce Bone, Assistant Treasurer of Noranda to Hampson:

"This will acknowledge receipt of your cheque for $11,035.83 as requested in my letter to you of June 20 which set out the dollar value and the total number of shares purchased for your account. This account is now closed on our books.

"As you are aware the shares are held in a numbered account at the Bank of Nova Scotia. As agreed they were instructed to hold them in street form unless they were in the name of small brokers or individuals in which case they were to be registered in Bansco & Co., approximately 45,000 shares have been so registered. They were also instructed to hold the dividends received on the Bansco shares in a special account pending instructions and not to claim any dividends on the other shares. They are also accumulating all charges for safekeeping, etc. to be billed at a later date.

"We are enclosing herewith the broker's contracts covering this transaction and a letter to the Bank of Nova Scotia instructing them to hold these shares for your account.

"I believe this completes our involvement in this transaction but if you require anything further please advise . . ."

27. Plaintiff's Exhibit, 6, Letter dated July 9, 1973 from Bone and Cork to Bank of Nova Scotia:

"Attention: Mr. D. C. Anderson
Securities

"You are holding in a special account subject to our instructions 748,000 shares of Texasgulf Inc. We asked that these be held in street form except that shares in individual or small brokers names be registered in Bansco & Co., and dividends on the Bansco shares be accumulated in a special account and the other dividends not be claimed at this time.

"This letter will authorize you to transfer these shares and any dividends received or owing thereon to the account of The Canada Development Corporation pending their further instructions. Please continue to accumulate your charges in connection with this transaction for their account until they provide you with billing instructions . . ."

28. Plaintiff's Exhibit 6, Letter dated July 10, 1973 from Hampson to Cork:

"Thanks for your letter of July 4 following up on our talk at your office the other Thursday afternoon.

"I hereby confirm that we agree forthwith to abandon the informal first-refusal arrangements between us and recognize that you wish to be free to deal with your investment in any way that suits your Company's interests.

"While we are very sorry that this idea did not lead to an association, we quite understand why you do not wish to pursue it.

"We, too, hope that there will be an opportunity for our two organizations to be associated in another project which will in fact bear fruit for both of us."

Thus from the meeting of June 27 CDC was left in the position where if it chose to proceed, it would have to do so alone.[29] At this point CDC could once again have entered the market to purchase shares of Texasgulf at the market price to increase its holdings to the 5% point authorized earlier by the Board of Directors but they determined to continue with the decision made on June 14, 1973 not to make any further purchases of Texasgulf stock. CDC did so because it wished to continue its compliance with United States securities laws, because it did not wish to expose itself to suit by selling shareholders should it later determine to proceed with the tender offer and because it wanted to give the market an opportunity to find its own level so that if they should decide to make an offer they could easily determine a fair offer price.[30] Especially in light of the Board's May 22 decision to decide at the July meeting on the question of making a tender offer, this appears to be an exercise of reasonable and conservative business judgment.

During the time that Noranda was purchasing Texasgulf stock on behalf of CDC, one J. Douglas Streit of Yellowknife Bear Mines, Ltd., and a shareholder of Texasgulf, wrote to the President of Texasgulf requesting to examine the record of shareholders of the company pursuant to Article 2.44,[31] Texas Business Corporation Act, V.A.T.S., for the purpose of soliciting proxies.[32] This was on May 18, 1973. On June 6, 1973 Fogarty wrote Streit advising him that Texasgulf would not provide him with a

29. Plaintiff's Exhibit 20, Memorandum to Directors of CDC for Board meeting of July 24, 1973, P. 1:

"We are recommending that this transaction be proceeded with on our own since to seek a partner runs the risk of breaching security, incurring delays, and of arriving at a less favourable deal—assuming we may wish to make one at all—than could be done after we have obtained our basic position."

30. Plaintiff's Exhibit 6, Ibid.

"As it became evident both to us and our expert advisors that present weak stock markets presented us with an ideal opportunity to make this acquisition in the very near future, we ceased acquiring shares in the market place and our last purchase was made on June 14. Once one gets close to, or arrives at, a decision to make a tender offer, further purchases w/o disclosure could open a liability to selling shareholders for loss of profits based on the withholding of information that might be material to them in deciding to sell their shares. More importantly, the market must be allowed to find its own level for a period of thirty days or more before making an offer if the pricing of the tender is to be realistic. We believe that the tender should be made shortly after the company's quarterly earnings appear, i. e. in the first few days of August."

31. Art. 2.44 Texas Business Corporation Act provides in pertinent part:

"B. Any person who shall have been a shareholder of record for at least six (6) months immediately preceding his demand, or who shall be the holder of record of at least five per cent (5%) of all the outstanding shares of a corporation, upon written demand stating the purpose thereof, shall have the right to examine, in person or by agent or attorney, at any reasonable time or times, for any proper purpose, its books and records of account, minutes, and record of shareholders, and shall be entitled to make extracts therefrom.

"C. Nothing herein contained shall impair the power of any court of competent jurisdiction, upon proof by a shareholder of proper purpose, irrespective of the period of time during which such shareholder shall have been a shareholder of record, and irrespective of the number of shares held by him, to compel the production, for examination by such shareholder, of the books and records of account, minutes, and record of shareholders of a corporation. Acts 1955, 54th Leg., P. 239, Ch. 64."

32. Plaintiff's exhibit 27, Letter of May 18, 1973 from Streit to Texasgulf:

"I am currently, and have been for the past six months, a shareholder of record of Texasgulf, Inc., and I hold my shares through the brokerage firm of Dominick & Dominick, New York, New York.

"Pursuant to Article 2.44 of the Texas Business Corporation Act, I hereby request the right to examine a current record of all shareholders of Texasgulf Inc. and to make extracts therefrom. This examination of the record of shareholders is to be conducted for the purpose of communicating with shareholders on matters relating to our mutual interest as shareholders and for the purpose of soliciting their proxies . . . . "

list unless he indicated a more specific reason for his request. On July 9, 1973 an attorney for Streit wrote another letter to Texasgulf reiterating Streit's request to examine the shareholder's list and again delineating the purpose for which Streit desired it as required by the statute. On July 10 Texasgulf responded that such a list was available only to shareholders of record who have been so for at least six months and that Mr. Streit did not qualify since he held his shares beneficially, and furthermore they would need a more specific statement of the purpose than had been provided. No further communication was received by Texasgulf prior to the filing of this lawsuit.

This series of correspondence is important in the Plaintiff's theory because early in May Noranda reported to Hampson that it was attempting to obtain a shareholder's list and expected to accomplish it although with some difficulty.[33] On May 17 Hampson reported to the CDC Board of Directors that they first wanted to obtain an up-to-date shareholders' list.[34] The Plaintiff contends that Streit was working for Noranda to obtain the shareholders' list and the fact that he was still trying to get the list after the supposed termination of the agreement between Noranda and CDC proves that the letters signifying termination of the agreement were a sham and that the partnership between Noranda and CDC still exists. The Plaintiff further maintains that Mr. Streit never renewed his request for the list because by the time he received the letter from Texasgulf, Noranda and CDC had already determined to go ahead with the offer, and no longer needed the list.

Plaintiff has shown that Noranda said that they would try to obtain a shareholders' list, and that a man named J. Douglas Streit tried to get a shareholders' list; that is all. They have failed to convince the Court that Streit was or is linked with either Noranda or CDC. The evidence indicates that CDC itself made no attempt to get a shareholders' list and that they did not know through whom Noranda was trying to get a list. The Plaintiff has seized on the fact that Streit was attempting to get a list during the time in question and tried to convince this Court that because he was obtaining a list, the only one he could be obtaining it for is Noranda and that therefore an agreement still exists between Noranda and CDC with respect to Texasgulf and that the letters of July 4 and July 10 are of no effect or import. The Court is not convinced. It is clear from the evidence that Streit could just have easily been acting for Anglo-American Company, who had also expressed an interest in Texasgulf; for himself; or for someone else.[35] The fact that he

33. Plaintiff's Exhibit 6, supra, Hampson Memorandum of May 9, 1973, Re: Visit with Ken Cork, Will Barber and Bruce Bone:
"Our friends are trying to obtain a shareholders' list and expect to accomplish this although with some difficulty."

34. Plaintiff's Exhibit 9, Memorandum of May 17, 1973 for Board of Directors of CDC Meeting, May 22, 1973.

35. Record at 406–410.
\* \* \* \* \*
"Q (By Mr. Hutcheson) Doctor, are you familiar with the newspapers called Globe and Mail in Canada?
A Yes, sir.
Q Have you ever heard of that?
A I certainly have.

Q You will see here that on this Defendfendant's Exhibit 27 under date of August 8th, 1973, Mr. Lutsky, the reporter, says:
'Reached at his farm near Sommerville yesterday, Mr. Streit laughed and said that his request for the shareholders list was made on his own behalf.'
See that in the newspaper?
A. Yes, sir.
Q Are you telling the Court that nobody has mentioned to you that that was published in the paper yesterday?
A No, sir. I haven't had a chance to catch up on these.
Q "He said he was not under any direction or control by anyone. He is a shareholder in Texasgulf, but describes himself as 'a small fish.' "

was trying to obtain a list at this time was pure coincidence and casts no doubt on the veracity of the letters of July 4 and July 10. Especially is this true in face of the denials of Hampson and others in a position to know.

The Plaintiff has failed to raise a question in the Court's mind that the letters between Noranda and CDC dated July 4 and July 10, respectively mean anything other than what they say or are designed for any purpose other than that of terminating the relationship between the two companies with respect to discussion of any plans relating to Texasgulf. Furthermore, the actions taken by CDC following the June 27 meeting with Noranda emphasize that from that

Now, no one advised you about that statement by Mr. Streit?

A No, sir.

Q Would you agree, in the light of that document, Dr. Fogarty, that you were maybe wrong, your belief about Mr. Streit?

A It could be wrong, yes.

Q Now, is there, please, anyone else in your company that you designate whom you feel would or might or probably would have more detailed information about Mr. Streit's alleged connection or non-connection with Noranda?

Is there anyone in a better position than you to know this?

A I don't think so.

Q Now, please look at paragraph 17 of the Complaint, Dr. Fogarty, on page 6, there before you, and you see reference in the last sentence there:

'Five days later, however, defendant Streit, still acting under the secret control and direction of Noranda, renewed his request to Texasgulf for a shareholder's list in a letter to Texasgulf dated July 9, 1973.'

Now, is there any other fact that you haven't testified to here that led you to make that allegation about Streit's relationship?

A No, sir, just the facts of the letter of July 9 requesting the shareholders list again written by his lawyer.

Q And you then have told us everything that leads you to believe this connection between Streit and Noranda. Is that correct?

A I believe so.

Q Now, yesterday, Dr. Fogarty, you testified about heavy, strong interest in Texasgulf owned by Anglo-American.

Isn't that correct? Do you recall that?

A Yes, I do.

Q What is Anglo-American, briefly? What company is it?

A It's Anglo-American Company, Anglo-American Company or Corporation of Canada.

Q What business is it engaged in?

A Essentially, it's in the mining business, holding company.

Q And it has about how many shares of stock in Texasgulf, if you know?

A I really don't know even yet, sir.

Q But it has, I believe you said, substantial block?

A It has been rumored, listening to rumors only, we have information by the rumor route only that they hold 600,000 shares or they could hold, but we have no verification of that in our transfer list.

Q I believe you testified one of the rumors was they might be trying to make a takeover of Texasgulf or to make a tender offer or something of that nature. Is that correct?

A Correct, that was the rumor.

Q Is there anything that causes you to believe that Mr. Streit was not acting for Anglo in making this inquiry, if he was acting for anyone but himself?

A We have no way to assess that, Mr. Hutcheson.

Q He could have been acting for Anglo, could he not, if he was not acting for himself?

A You mean if he was not acting for Noranda or himself, he could have been acting for Anglo?

Q Yes.

A I suppose he could.

Q Did you ever ask the Anglo people whether he was acting for them?

A We have had no communication with the Anglo people."

The Court would observe that this answer series is typical of the response given by Plaintiff's witness to questions concerning the allegations in Plaintiff's Complaint. Consistently he admitted his allegations were on information and belief and could enumerate no facts to substantiate them.

The Court is mindful of the caution which should be used in examining such allegations. As stated in Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc., 446 F. 2d 353 (5th Cir. 1971):

"While we do not rule out the possibility that that hearsay may form the basis for, or contribute to, the issuance of a preliminary injunction, the district courts have shown

point on CDC was acting alone in its decisions with relation to the tender offer for Texasgulf stock. At the July 6, 1973 Executive Committee meeting of CDC, initial consideration was given to the formulation of a plan to be presented to the Board of CDC with a view toward the making of a tender offer for the stock of Texasgulf and shortly thereafter, on July 9, 1973, Mr. Gene Woodfin, of Loeb, Rhoades & Co., an investment banking firm, was approached with an inquiry as to whether Loeb, Rhoades & Co. would be willing to act as an investment banker and dealer-manager in connection with a proposed tender offer.

Mr. Woodfin met on July 11, 1973 with representatives of CDC to discuss such essentials and at that point, unresolved considerations of the tender offer as the number of shares sought, the price range, availability of funds, procedure to be followed, the timing and other critical mechanics of an offer. It was concluded that the issue as to whether or not a tender would be made would be presented to the CDC Executive Committee at a meeting to be held by it on July 23, 1973, and if approved, the matter would be presented to a meeting of the CDC Board scheduled for July 24, 1973.

CDC first began its approaches to the Toronto-Dominion Bank on July 16, 1973 to secure from it the bulk of the required financing. At that meeting the Bank was not advised as to the identity of Texasgulf and was simply asked if it would advance a line of credit to per-

mit unspecified stock purchases. The bank, which was relying solely on the credit of CDC did not on July 16, 1973, want to know the identity of the company whose stock CDC proposed to purchase.[36] The bank did not agree until July 23, 1973 to make available the $160,000,000 line of credit. Likewise, the Government of Canada did not agree to provide the additional $75,000,000 of equity financing until July 23, 1973.

At the Executive Committee meeting of CDC on July 23, 1973 Woodfin urged the members to *accelerate* the tentative time table for the proposed tender offer because Texasgulf had released its earnings statement on July 20, 1973, a date earlier than usual. He also made recommendations to the CDC Executive Committee as to the price to be paid for the stock under the tender offer. Woodfin noted that Texasgulf stock was then selling at around $24.00 (U.S.) per share and he suggested a range of a low of $28.00 (U.S.) per share to a high of $30.00 (U.S.) per share as the proposed tender offer price. Selection of that range was made upon considerations as to how large a premium over the market price of the stock would be required in order to make the tender offer successful. The compromise figure reached, of $29.00 (U.S.) was felt to be a very generous price-earnings multiple for this kind of a stock.[37] The CDC Executive Committee on July 23, 1973 recommended that the proposal be placed before the CDC Board at its July 24, 1973 meeting.

appropriate reluctance to issue such orders where the moving party substantiates his side of a factual dispute on information and belief."

36. Obviously, for security reasons the bank did not want to be privy to such information as the record indicates, they were looking at it on the basis of a general line of credit and not on the basis of any specific acquisition. Record at 1359.

37. Highs and Lows of Texasgulf shares sold on New York Stock Exchange as appear in tender offer, Plaintiff's Exhibit 25:

| | HIGH | LOW |
|---|---|---|
| 1970 | 23¼ | 13 |
| 1971 | 24⅜ | 11¼ |
| 1972 | 20¾ | 14¾ |
| 1973-1st quarter | 25¼ | 17⅛ |
| 2nd quarter | 24 | 18¾ |
| 3rd quarter (thru June 23) | 24⅛ | 20⅜ |

The closing price on the New York Stock Exchange on July 24, 1973 (day prior to tender offer) was $24¼. On the day after the tender offer was announced, Thursday, July 26, the stock after reaching a high of $27.00, closed at $26¼.

At both the July 23, 1973 CDC Executive Committee meeting and at the July 24, 1973 CDC Board meeting there was placed before those present a memorandum prepared by management recommending the proposed tender offer.[38] With reference to Noranda, the memorandum noted management's express recommendation "that this transaction be proceeded with on our own." Further, the memorandum set forth the definite views of CDC management concerning Texasgulf, which differed somewhat from earlier views tentatively expressed by various members of the staff and by the analyst who prepared a report at the request of management. For example, while some questions previously had been raised by the analyst as to the profitability of Texasgulf's Agricultural and Chemical division's operations, the memorandum prepared for the July 24, 1973 CDC Board meeting now concluded that it was expected that that division would "make a major contribution to Texasgulf's income and cash flow over the next several years."[39] Likewise while the analyst had in May expressed his reservations concerning Texasgulf's management, the CDC management memorandum of July 24, 1973 concluded that no intention then existed on the part of CDC to disturb Texasgulf's management,[40] although conditions which might develop after the tender offer might require it. Thus the tender offer was worded to reflect that possibility.[41] The July 24, 1973 memorandum also set forth the legal reasons why the recommended tender offer could not be made to Canadians,[42] and detailed the financing vehicles to be employed, including alternative methods such as CDC share issuances and long-term borrowings to cover interest payments. On July 24, 1973 the CDC Board approved the proposed tender. The Board in so doing was specifically advised of all of the facts set forth in the tender offer, including the absence of any contemplation of spin-offs, management changes or continued relationship with Noranda.

38. Plaintiff's Exhibit 20, supra.

39. Ibid. P. 2:

"The Agriculture and Chemical Division is currently operating at profitable levels following several years of losses. We expect the Division to make a major contribution to Texasgulf's income and cash flow over the next several years. Sulphur is assigned a low value in relation to the singe of the total company since—despite strengthening demand—excess world supplies and rising costs will make Frasch sulphur industry marginal at best. A growing captive market in its fertilizer business should help Texasgulf in this regard."

"The long-run future of the phosphate fertilizer industry, particularly in the United States is good . . . ."

40. Ibid. P. 11:

"It must nevertheless be pointed out that even with a successful tender offer, we may have difficulty in obtaining the full cooperation of management in our post acquisition audit and analysis of the company. For this reason, we . . . must be prepared to consider the possible need to replace directors and/or senior management as the situation unfolds.

41. Plaintiff's Exhibit 25, supra, P. 6:

"Offeror cannot state at this time what changes it might seek to make in the management and business of the company. It intends to review the situation and, if it acquires effective control of the Company, to make such changes as it deems in the best interest of the Company."

42. Plaintiff's Exhibit, supra, P. 6:

"It is our recommendation that the tender offer not be made in Canada. Texas counsel have advised that the minimum period for obtaining a shareholders' list would likely be a month to six weeks and that it could be as long as a year; in either event, the element of surprise is lost. The laws of Ontario and the Western Provinces require that any takeover offer be mailed direct to shareholders rather than made through newspaper advertisements and dealer solicitations as is permitted in the United States. The Executive Committee did not believe it was justifiable to make a Canadian offer only in Quebec and the Maritimes since the main market and holdings are almost certainly in Ontario and the Western Provinces . . . ."

"Also potentially excluded are residents of states in the United States 'in which this offer or acceptance thereof would not be in compliance with the securities or blue sky laws of such state.'" Plaintiff's Exhibit 25, Tender Offer P. 7, ¶ 11.

The rest of the facts as to what transpired following approval are as set out previously beginning on page 383 of this Opinion with a few additions. On the flight to New York City after the CDC Board had approved the tender offer, Hampson repeated to Woodfin the suggestion that he had made to Woodfin on the prior day that at the meeting scheduled for later that day (July 24, 1973) with Plaintiff's management an offer of employment contracts be made to Texasgulf's management to further reassure them. However, as he had done on the prior day, Woodfin advised Hampson not to make any such proffer since it might be misconstrued by Plaintiff's management and treated as an insult or an attempt to buy their support. Hampson accepted his advice, although he was not sure it was the right advice. Woodfin now says this was a mistake and that if he had the same advice to give over he would reverse it.

Here it is necessary to expound on the events at the meeting on the afternoon of July 24, 1973 in the office of Mr. Stephens at Texasgulf with Hampson, Crowe, Woodfin and Fogarty present. Briefly, it was explained to the Texasgulf representatives that there had been no prior communication with them with respect to the tender offer or any consideration thereof because of both the requirements of the Securities and Exchange Act and because there was some serious concern that the history of this company had shown that it was accident-prone in terms of litigation.[43]

The CDC representatives further explained to Fogarty and Stephens that CDC had a consistent policy of long term investments, reliance upon existing self-contained management and that what it sought was simply an effective voice in the policy of the company as exhibited by such representation on the Board of Directors of the company as would be appropriate to CDC's shareholdings. In that regard the parties to

the meeting have testified that the meeting was in all respects a cordial one and that the CDC representatives left believing that management of Texasgulf might be kindly disposed to the tender offer. The CDC representatives volunteered to stay in New York and be available to meet with any members of the Texasgulf Board or with any of its officers desirous of meeting with them and desirous of obtaining additional information, and to that end they remained in New York for two days. However, Texasgulf never made any effort to communicate with them. It is clear to the Court that CDC did everything reasonable and possible under the circumstances and in light of Texasgulf's unhappy history when previously possessed of advance information to make this tender offer a "friendly one" and that any aura of unfriendliness which it might possess now is directly a result of the Plaintiff's action.

The attorneys for Texasgulf have pointed to some circumstances and events that they say could convince the Court that there was a conspiracy and that it still exists. Looking at all the circumstances as a whole and not just only by examining its dismembered and separate parts, and drawing logical inferences and deductions, it is clear to this Court that these events do not point to an unlawful conspiracy. The Court accepts the account given by the witnesses on behalf of CDC of the facts of the case. The Court finds that Hampson, Woodfin and Crowe, who knew as much about the transactions as anyone, are very credible witnesses. The affidavits of Paul Britton Paine, President of Montreal Trust Co.; Ross Arnold Perigoe, Financial Vice-President of The Imperial Life Assurance Company of Canada; Louis R. Desmarais, Vice-Chairman of the Board of CDC and President of Power Corporation of Canada, Ltd.; John H. Moore, Director of CDC; John P. Gallagher, Director of CDC and Pres-

---

43. See Securities and Exchange Commission v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), cert. denied, sub nom., Coates v. Securities and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

ident of Dome Petroleum Ltd.; and Simon S. Reisman, Deputy Minister of Finance for Canada and ex officio member of the Board of Directors of CDC, corroborate in every respect the account given by these three participants.

The sum total of this series of events is that while Noranda did handle the preliminary stock purchases for CDC using CDC's money and that some of the top executives of both companies did consider and discuss the possibilities of such a joint venture, when it came down to decision making time the decision on the part of Noranda was not to engage in any such venture, and there is no credible evidence to indicate that decision was anything but final.

■ Texasgulf has failed to make the clear showing necessary of probable success on the merits or even serious, substantial questions in relation to the allegations of a plan or conspiracy in violation of Section 14(e) of the Securities and Exchange Act of 1934 to entitle it to preliminary injunctive relief. From the credible and competent evidence the Court is convinced that CDC, its officers, and directors did not engage in any fraudulent conspiracy as alleged by Texasgulf.

Texasgulf further alleges in relation to its conspiracy allegations that CDC, Noranda and the other named Defendants violated Section 13(d) of the Securities and Exchange Act of 1934 in that they constituted a group within the meaning of that statute that held more that 5% of the outstanding shares of a security, namely Texasgulf, prior to making the tender offer and that they failed to make any filing with the SEC disclosing that fact.

■ The filing requirements of Section 13(d)(1) are triggered by an individual or a group acquiring in excess of 5% of any class of equity security. A group is defined in Section 13(d) as an aggregation of persons or entities who "act . . . for the purpose of acquiring, holding or disposing of securities . . . ." Each member of a statutory group is deemed to acquire the shares beneficially owned by the other members upon formation of the group. As a result, if, after the group is formed, the aggregate beneficial holdings of its members exceed 5%, the requirement of Section 13(d)(1) is triggered even without additional purchases of stock by any of its members. See GAF Corporation v. Milstein, 453 F.2d 709 (2nd Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972).

■ It takes more than the arithmetic of adding up shares to determine that a statutory group exists and that a filing must be made. Two criteria must be met: (1) The members must agree to act together for the purpose of acquiring, holding, or disposing of securities; and (2) once the members agree to act, they must own beneficially or acquire beneficially in excess of 5% of a class of equity security. Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person. There must be agreement to act in concert. GAF Corporation v. Milstein, *supra*.

Texasgulf admits throughout its pleadings that the aggregate total shares of CDC and Noranda while approaching five percent, never hit five percent of the total shares outstanding. But it alleges that there are the individual Defendants and others connected with the two companies that own shares of Texasgulf and thus constitute part of the group. For example, Texasgulf adds to the shares held by Noranda and CDC those held by Streit. It also includes shares held of record by Montreal Trust Company and Imperial Life Assurance Company of Canada as stock belonging to the "group." How Texasgulf arrives at this connection is worth elaborating. Mr. Louis R. Desmarais is Vice Chairman, a Director and member of the executive committee of CDC. He owns no Texasgulf stock, either beneficially or of record. Desmarais is President of Power Corporation of Canada, Ltd. which

owns a controlling stock interest in Montreal Trust Company which according to Plaintiff is the record owner of 112,004 shares of Texasgulf, and also Imperial Life Assurance Co. of Canada, Ltd., which according to Plaintiff, owns 36,600 shares of Texasgulf. The evidence indicates that Desmarais is neither an officer nor a director of Montreal Trust or Imperial Life.

Throughout the record it is evident that CDC was aware of the five percent filing trigger of 13(d) and that they purposely stopped purchasing stock at around 2½% of shares outstanding because they knew Noranda had close to that amount. Thus if they did decide to enter into some kind of joint tender offer plan with Noranda they would be in danger of triggering the filing requirement and having to file a 13(d) before they were ready to announce their tender.

■ It was specifically because, between 1968 and 1970, some offerors consciously limited their purchases to just under the then 10% triggering point to avoid filing, that Congress in 1970, amended the Williams Act to provide for disclosure at 5%. From the legislative history of the amendment it is clear that Congress recognized that conscious avoidance of the disclosure requirements by keeping below the triggering point is not violative of the law.

"The reduction for [sic] 10 to 5 percent would provide public disclosure of impending corporate takeovers at a more meaningful level. The Securities and Exchange Commission has informed your committee that in some instances persons or companies undertaking an acquisition have limited their purchases of stock in the open market to 8 or 9 percent as a means of avoiding the disclosure requirements of Public Law 90–439. This practice deprives investors of the material information which is necessary to enable them to make a deci-

sion whether to accept or reject the tender offer.

"An investment of between 5 and 10 percent of the securities of a company can have a significant impact on the public market for that company's stock. Shareholders of the target company are entitled to full disclosure when over 5 percent of their company's stock is to be acquired by an outside group. These acquisitions may lead to important changes in the management or business of the company and the shareholders should be fully informed . . ." 1970 U.S.Code Cong. & Admin.News at pp. 5027–5028.

Thus, it is evident that CDC's undisclosed purchases and conscious avoidance of the 5% triggering requirement, whether alone or together with Noranda, are not a violation of the law.

■ The Court is convinced that Texasgulf has failed to make a clear showing of serious questions with reference to this allegation such as to make it fair ground for litigation, much less has it shown a reasonable probability of succeeding on the merits of this claim in light of the Court's finding that no conspiracy exists between CDC and Noranda, and that Streit is not connected with either one of them. Without Noranda and Streit, it would take even more shareholders to constitute a group over 5%. Yet CDC has proved that even more of the alleged group—for example, Mr. Desmarias and Mr. John Gallagher of Dome Petroleum, Ltd.—were neither the beneficial or record owners of stock in Texasgulf.[44] Furthermore, Texasgulf has failed to make any showing that the persons constituting the alleged group had ever agreed to act, let alone acted together as required by Section 13(d) "for the purpose of acquiring, holding or disposing of securities." Without some indication of concerted activity required to bring the statute into play this Court is compelled to find that no group

44. Defendants' Exhibit 30 and 34. Affidavits of Louis R. Desmarais and John Gallagher.

exists within the meaning of Section 13(d).[45]

Finally, Texasgulf alleges that under Section 14(d) of the Securities and Exchange Act of 1934 a group that commences a tender offer must file a Schedule 13D (as set out in Section 14(d) of the Securities and Exchange Act) regardless of its holdings; that such schedule must contain full information with respect to each member of the group; and that Noranda, CDC, other named Defendants, and others at present unknown, constitute such a group and have failed to make the required filing. In light of the Court's holding that Texasgulf has failed to establish the existence of a conspiracy between Noranda, Streit and others, and has further failed to establish the existence of any group within the meaning of Section 13(d) who have previously acted together or might be doing so now, it is evident that Texasgulf must also fail on this allegation. CDC acted alone in the making of the tender offer; the Schedule 13D filed by CDC reflects that fact and contains full information with respect to CDC; the filing required by Section 14(d) has been made.

## THE ANTITRUST ISSUE

Independent of the allegations of securities law violations, Texasgulf alleges that the proposed acquisition of stock by CDC would violate Section 1 of the Sherman Act [46] and Section 7 of the Clayton Act [47] and that therefore this Court should grant it injunctive relief as authorized by Section 16 of the Clayton Act.[48] Specifically, Texasgulf contends that in light of the conspiracy between CDC, Noranda and others, the acquisition of a controlling stock interest in Texasgulf would eliminate actual competition between Texasgulf and Noranda in violation of Section 1 of the Sherman Act because Noranda and Texasgulf are major competitors in such metal markets as potash, slab silver and zinc. Thus the acquisition of Texasgulf by the CDC–Noranda group would con-

45. Even if the Court had found a group within the meaning of Section 13(d) to exist, the appropriate remedy would be an injunction until it is determined that the group had complied with 13(d). Bath Industries v. Blot, 427 F.2d 97 (7th Cir. 1970).

46. 15 U.S.C. § 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal . . . ."

47. 15 U.S.C. § 18 provides in pertinent part: "§ 18. Acquisition by one corporation of stock of another.
"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.
"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.
"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, the substantial lessening of competition."

48. 15 U.S.C. § 26 provides in relevant part:
"Any person, firm, corporation, or association shall be entitled to seek for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by violation of the antitrust laws, including sections 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . ."

stitute a restraint on trade in that it would eliminate the competition between Texasgulf and Noranda and would result in them being the dominant force in the market. This would also constitute a violation of Section 7 because the effect would be to substantially lessen competition and to create a monopoly because of the market position the Texasgulf/Noranda combination would occupy.

Even without the conspiracy, Texasgulf maintains that the acquisition would lessen competition in violation of Section 7 in that it would eliminate future competition between CDC and Texasgulf. Texasgulf bases this position on the premise that CDC, having decided to enter the mining industry, became at that point a competitor of great significance, and that it therefore should enter the industry *de novo* or via the toehold approach of acquiring one of the smaller mining companies and developing it to be a substantial competitor in the field.

CDC takes the position that with respect to the Sherman Act, the Act is inapplicable because there is no conspiracy or any kind of agreement between CDC, Noranda and others to acquire Texasgulf. Furthermore, CDC argues, that even if Texasgulf could show such a conspiracy, under United States v. Aluminum Company of America, 148 F.2d 416, 443–444 (2d Cir. 1945), it has failed to state a claim upon which relief can be granted because in order for an alleged conspiracy between solely foreign persons or entities to be actionable, it must have *already* resulted in substantial anticompetitive effects in the United States. In response to Texasgulf's Section 7 allegations, CDC reiterates that there is no conspiracy or relationship with Noranda or others to acquire Texasgulf that could result in a lessening of competition. Moreover, CDC argues, it is not a potential competitor of Texasgulf. It has sixteen employees, it is not engaged in any line of commerce much less lines similar or related to the mining industry, and the very nature of the

natural resource business being governed by the availability of those resources makes entry *de novo* an enormously expensive and speculative undertaking and therefore unrealistic for a company with sixteen employees.

At this point in the litigation the Court is not required to determine whether in fact the Plaintiff, Texasgulf, has proven violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act. Our role is limited to deciding whether the evidence before us demonstrates that Plaintiff's allegations are of sufficient substance to warrant an examination of the other requirements necessary to the grant of preliminary injunctive relief. Gulf & Western Industries, Inc. v. Great Atlantic and Pacific Tea Company, 476 F.2d 687 (2d Cir. 1973).

The standard for evaluating mergers and acquisitions under the Sherman Act as announced by the Supreme Court in United States v. First National Bank and Trust, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), provides:

> "Where merging companies are major competitive factors in a relevant market, the elimination of significant competition between them, by merger or consolidation itself constitutes a violation of § 1 of the Sherman Act." 376 U.S. at 671–672, 84 S.Ct. at 1037.

The standard to be applied in evaluating the merits of a Section 7 Clayton Act allegation is "whether the probable future effect of the transaction will be substantially to lessen competition." Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

While it may be that as to the Sherman Act allegations, under the *Alcoa* case, Texasgulf has failed to state a claim on which this Court can grant relief because the companies involved are both foreign entities and there have not been any actual anticompetitive effects, in light of the broad reach and interpretation given the antitrust laws by the

courts, we feel it best to examine their substance as grounds for preliminary injunctive relief.

Central to the merit of much of the Plaintiff's antitrust violation allegations is the existence of some kind of agreement or understanding between CDC and Noranda to acquire Texasgulf since it is Noranda and Texasgulf who are presently competitors in several relevant areas. The Court has previously discussed the relationship between CDC and Noranda in the acquisition of Texasgulf stock and found that while Noranda acted as the agent for CDC in purchasing Texasgulf stock prior to the tender offer during the time that they were both considering the possibility of a joint acquisition, such arrangement was terminated and the parties severed all relationship with respect to any plans to jointly acquire Texasgulf. Thus CDC, solely, is making the offer for Texasgulf stock and there is no plan for future involvement of Noranda with CDC in relation to Texasgulf. There is no evidence, or even suggestion in the pleadings or at the hearing that CDC is at present a competitor of Texasgulf in any market. The acquisition of Texasgulf by CDC will in no way eliminate competition between Texasgulf and Noranda, as Noranda is in no sense an acquiring company. It is fundamental to proving a Section 1 violation that competition between the acquiring and acquired companies exist in the first place to find that it will be eliminated. Therefore, Plaintiff has failed to demonstrate to the Court a sufficient likelihood of success on the Sherman Act claim to warrant a preliminary injunction.

Likewise on the Section 7 Clayton Act violation allegation that the effect of the acquisition of Texasgulf by CDC and Noranda will be to substantially lessen competition between Noranda and Texasgulf, Texasgulf has failed to demonstrate a sufficient likelihood of success. The acquisition of stock is being made by CDC, not Noranda. There can be no lessening of competition between Texasgulf and Noranda as a result of CDC's acquisition of Texasgulf stock. There is simply no evidence of any continuing arrangement between CDC and Noranda with relation to Texasgulf which would constitute a violation of the antitrust laws.

Plaintiff's contention that the acquisition of Texasgulf by CDC alone, without Noranda, eliminates potential competition in violation of Section 7 of the Clayton Act, is likewise without sufficient merit to predicate the granting of a preliminary injunction.[49]

As the Court has noted before, Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be to substantially lessen competition or tend to create a monopoly. The scope of Section 7 is broad. Not only are many mergers between competitors in a market proscribed, Brown Shoe, Inc. v. United States, *supra*, but it also bars certain acquisitions of a market competitor by a noncompetitor such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition. FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). Entry through merger by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior is also questionable under Sec-

---

49. The Court would observe that § 7 specifically excludes from coverage stock purchases made for investment until the voting powers attendant to the stock are exercised to bring about a lessening of competition. There was evidence at the hearing that while CDC spoke in terms of "effective control" in its tender offer, it was mainly concerned with making a solid investment, and had made no decision on changes it would make by exerting its control. Indeed some testimony indicated that even if they attained 35% of the stock there was still a strong likelihood of them not getting control since management would still control the proxy machinery. Thus should this in fact turn out to be an investment, Section 7 would be inapplicable.

tion 7. Although its competitive conduct in the market may be the mirror image of that of the acquired company, it may nevertheless violate Section 7 because the entry eliminates a potential competitor exercising present influence on the market. FTC v. Procter & Gamble Co., *supra*; United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964). As specifically delineated by the Supreme Court in *Penn-Olin*:

> "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated." 378 U.S. at 174, 84 S.Ct. at 1719.

The critical question in examining the merger involving an acquisition by a company not competing in the relevant market is not what the company's internal company decisions were but whether, given its financial capabilities and conditions in the market, it would be reasonable to consider it a potential entrant into that market. United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). This is not to say that having been found to be a potential entrant in the market a company can only enter the market *de novo*. As observed by Mr. Justice Marshall in his concurring opinion in *Falstaff*:

> "If the company would have remained outside the market but for the possibility of entry by acquisition and if it is exerting no influence as a perceived potential entrant, then there will normally be no competitive loss when it enters by acquisition. . . . Thus mere entry by acquisition would not prima facie establish a firm's status as an actual potential entrant. For example, a firm although able to enter the market by acquisition, might, be-

cause of inability to shoulder the de novo start-up costs, be unable to enter de novo. But where a powerful firm is engaging in a related line of commerce at the fringe of the relevant market, where it has strong incentive to enter the market de novo, and where it has the financial capabilities to do so, we have not hesitated to ascribe to it the rule of an actual potential entrant. In such cases, we have held that § 7 prohibits an entry by acquisition since such an entry eliminates the possibility of future actual competition which would occur if there were an entry de novo." 410 U.S. at 561, 93 S.Ct. at 1115, 35 L.Ed.2d at 498.

It has already been observed that CDC, at present, is not competitor of Texasgulf. Thus it must be determined if CDC is the kind of potential entrant in the market as discussed above such that its acquisition of Texasgulf would be suspect under Section 7. To begin with, the likelihood of CDC entering the natural resources industry *de novo* is remote. This conclusion is based not only on the internal decision of the Board of Directors of CDC that such a step would not be feasible but also on the general financial considerations and the nature of the natural resources industry itself. As has been observed before CDC is a company of sixteen employees. Its Board of Directors represent a large cross-section of Canadian business, but none possess any degree of expertise in the mining business.[50] Indeed CDC is not engaged in any line of commerce, much less the line of commerce in which Texasgulf is engaged or a related line. Thus the court does not have a situation such as found in *Procter & Gamble,* or *Falstaff* where the acquiring company was already engaged in the actual production of the same or similar products as the company it sought to acquire. CDC is a company which invests in other companies and has been described even by

---

50. A sample of the occupations of the Directors shows them to be engaged in textiles, investments, manufacturing of dairy products, oil and natural gas industry, transportation, construction, and academic work.

Plaintiff's witnesses as a "closed-end investment trust." [51] Furthermore, the natural resource field is not an ordinary line of commerce. The availability of natural resources is limited and even if they can be located (which in and of itself is an expensive proposition), their development is an enormously expensive and speculative undertaking as pointed out by Plaintiff himself with respect to Texasgulf's Australian operations. Furthermore, one cannot logically infer that because CDC obtained financing for their tender offer with relative ease [52] they could with the same ease obtain financing for starting a natural resource venture from the beginning with its attendant high risk of great expenditure and no return. In the face of these factors it is clear that CDC cannot enter the market through its own operational development (i. e. *de novo*) but must do so through acquisition.

Indeed, Texasgulf concedes in its brief [53] that it does not argue that CDC must enter the market *de novo* and may not enter it through acquisitions. Rather, Plaintiff takes the position that CDC may not enter by acquiring a significant competitive factor but must acquire a "toehold" in the market by acquiring one of the smaller mining firms and building it to be a major competitor.

This "toehold" theory is relatively new in antitrust law and while it has been inferred in several opinions of the Supreme Court, that Court has to this point specifically declined to rule on it. See United States v. Falstaff Brewing Corp., *supra.* In Kennecott Copper Corp. v. FTC, 467 F.2d 67 (10th Cir. 1972) the Court found Kennecott to be a potential competitor in the coal industry and thus found its acquisition of one of the leading coal companies to be violative of Section 7, Clayton Act, on the theory that Kennecott should have entered by acquiring one of the smaller companies in the industry. This conclusion was based on the evidence Kennecott was peculiarly well qualified to be not only a likely entrant but the most likely entrant into the coal business because of a combination of its interest in the industry from 1963, its long experience in hardrock mining and its acknowledged capabilities, its financial resources, and its close proximity as a copper producer to the coal industry.

Likewise in Bendix Corp. v. FTC, 450 F.2d 534 (6th Cir. 1971) the situation was one of an active producer of similar and/or related products attempting to acquire one of the major producers of those products to which the acquiring company's products were related. The acquisition challenged in that case was the acquisition of Fram Corporation, a leading producer of various kinds of filters including automotive filters, aerospace filters and filter water separators with about 90% of its automotive division sales concentrated in the passenger car market, by Bendix Corporation, the producer of automotive parts including heavy duty oil and fuel filters for use in large trucks, tractors and off highway equipment. In that case the Circuit Court acknowledged the viability of the "toehold" theory in remanding the case for more evidence on that theory.

The situation present in the case before this Court is far removed from that in *Kennecott* and *Bendix*. Each of those cases were merger cases where the acquiring company by some manner literal-

---

51. Record at 878.

52. The funds to be used by Offeror to purchase shares of the Company's Common Stock tendered pursuant to this Offer will be financed to the extent of approximately $75,-000,000 (Cdn.) from Offeror's own funds, which are presently represented by short-term investments; to the extent of $75,000,000 (Cdn.) by a subscription by the Government of Canada to purchase additional shares of Offeror; and to the extent of up to $160,000,-000 with funds to be loaned to Offeror by the Toronto-Dominion Bank pursuant to a line-of-credit which has been established by Offeror with such Bank.

53. Post-Hearing Brief in Support of Plaintiff's Motion For Preliminary Injunction. P. 48.

ly bought the assets of the company it sought to acquire [54] and merged those assets into its own company. CDC's purchase of Texasgulf stock is basically a shifting of ownership of stock already publicly held; the money CDC pays for the stock will not go into Texasgulf but to the stockholders. Furthermore, in the toehold case the acquiring companies have in each instance been actual producers of related products who have demonstrated expertise and ability, companies who logically could be expected to expand or develop into the area of production of the companies which they were seeking to acquire. CDC, on the other hand, is not an operating company. It is basically an investment company which, while it is interested in the long term development of the companies in which it acquires an interest in order to enhance its investment, does not seek or desire a hand in the day to day operation of the company: it possesses neither the expertise or manpower to do that.

 In short, the situation before this Court of CDC buying Texasgulf stock does not fit within the framework of the "toehold" acquisition theory as defined by *Kennecott* and *Bendix*. Moreover the fact that CDC announced its interest in investing in the mining industry does not per se make it a potential competitor within the scope of Section 7. As shown by the cases previously discussed it must be an operating company

engaged in the same or related lines of commerce, and this CDC is not.

 As noted before the Court's role at this stage is to decide on the basis of the evidence before us if Plaintiff's allegations are of sufficient substance to warrant the issuance of a preliminary injunction, keeping in mind that:

"A balancing of the equities—in terms of injury to the public interest if an injunction were denied, as against injury to the defendants, if it were granted—is a relevant factor, *once the probability of success standard has been met*, in deciding whether to grant injunctive relief." Gulf and Western Industries, Inc. v. Great Atlantic and Pacific Tea Company, supra (emphasis added).

The Court is of the opinion, in light of the Court's findings as to the non-existence of the alleged conspiracy between Noranda and CDC, and the lack of merit to the contention that CDC is a potential competitor, that Plaintiff has failed to demonstrate to the Court a sufficient showing of probable success on the merits of his Sherman and Clayton Act allegations or even that such serious, substantial and difficult questions exist as to make them fair grounds for litigation.

## THE QUESTION OF ARTICLE 1527

Texasgulf also urges the issuance of an injunction on the basis of Article 1527, Texas Revised Civil Statutes.[55]

---

54. For example, Kennecott paid 285 million dollars in cash and assumed 36.5 million dollars in liabilities and subject to the reservation of a production payment from Peabody's Coal Properties which was sold by Peabody for about 300 million dollars in cash, to acquire Peabody. Kennecott Copper Corp. v. FTC, *supra*, 467 F.2d at 69.

55. Article 1527 provides:
"Corporations created for the purpose of engaging in international trading and the purchase and sale of the products of the farm, ranch, orchard, mine and forest shall be empowered to pledge, borrow, hypothecate and receive in trust for the purpose of sale any and all products of the farm, ranch, and

orchard, and shall be authorized to buy, sell and exchange raw products of the farm, ranch, orchard, mine and forest, and to take in payment therefor finished products of whatever kind and character that they may determine at a fair, equitable and just valuation. Such corporations shall have power to charter, lease, construct or purchase necessary vessels, ships, docks, wharves, and warehouses for the conduct of their business; to pool products of the farm in the sale of same; to hypothecate or pledge the credit of such corporations for the products so received under contract for the necessary funds with which to market same; to borrow money as other business corporations and to lend the same upon products that they may be engaged in the sale of, either

Plaintiff's argument here is not only that the existence of this statute should have been disclosed, but, that even if disclosed Article 1527 is a sufficient independent ground requiring the issuance of a preliminary injunction. Simply stated the proposition is that upon consummation of the tender offer Texasgulf would be in violation of Article 1527, a violation which would lead to the cancellation of Texasgulf's charter and the placing of all its properties in receivership. In the interest of protecting non-tendering shareholders and Texasgulf's corporate existence, Texasgulf would have this Court halt the tender offer until a determination can be made, on the merits, as to the applicability of Article 1527 and the consequences of its violation.

While the issue is not without some difficulty, primarily due to the fact that no Texas court has ever found occasion to interpret this provision, this Court is convinced that Article 1527 does not apply and was not intended to apply to corporations such as Texasgulf. Texasgulf is simply not an "international trading company" within the meaning of that statute. Texasgulf has not established by a clear showing either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Specifically, the Court finds that Texasgulf has not established by a clear showing a probable success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation.

The issuance of a preliminary injunction pending a hearing on the merits would serve no purpose at this juncture. Texasgulf has had an opportunity to produce, and has produced, virtually every available argument and every available bit of information bearing on the applicability of Article 1527. Indeed, the only testimony excluded on this issue, the affidavit of a University of Texas law professor, was excluded at the insistence of Texasgulf.

Texasgulf argues that the exclusion of their affidavit would not preclude the affiant, who was alleged to have been in the courtroom for two days, from being called as a witness for CDC and draws an inference that the witness would not have helped CDC. The Court cannot speculate on this one way or the other because at the time of the offer of the affidavit the witness had apparently left the city.

The Court did have the benefit of expert testimony by affidavit [56] on precisely what an "international trading company" is; its qualities and attributes.

---

as owner, agent, consignee, or commission merchant. They shall have generally and specially all the rights, powers and privileges belonging to a corporation engaging in international trading. Such corporations shall have authority to receive in payment of capital stock, manufacturing establishments, and the stocks and bonds of same at a fair and just valuation, and to so receive the products of the farm, ranch and orchard. Whenever property is received in payment for capital stock, the Secretary of State shall appoint a board of appraisers who are familiar with the valuations of such property so taken in payment for capital stock to appraise same and furnish him with a sworn statement of the valuations of the property so taken in payment for capital stock. On receipt of same he shall approve, file and record the charter of such corporation. A majority of the stock shall in all instances be owned by citizens of the United States, and a majority of the officers and directors thereof shall in all instances be citizens of the United States and of this State. Nothing in this article shall prevent citizens of foreign countries from becoming stockholders in such corporations, but the control of such corporations shall never in any instance be vested in citizens of other countries than the United States. Violation of any provision herein as to the control of stock of such corporation shall be sufficient for the Secretary of State to cancel the charter of said corporation and same shall be placed in the hands of a receiver as provided by law. Acts 1921, p. 227."

56. The affiant is Dr. Francis Scott Yeager, an Associate Professor of Economics and Finance in the College of Business at the University of Houston.

Also historically known as joint stock companies, they were first organized in the sixteenth and seventeenth centuries to exploit the trading possibilities resulting from the explorations and discoveries which were occurring at that point in time. In the words of the affiant, "These trading companies imported to Europe the raw materials and other native products of the new lands— gold, silver, furs, lumbers, fish, spices— and exported manufactures. They were in a·true sense 'trading companies' because they owned nothing except ships, and frequently not even those; they were purchasers, transporters, sellers— at both ends of the trip between the European port and the colonial port . . . [T]hey performed indispensable economic services as intermediaries between the original producer and the final purchaser . . . But they were not producers in the sense that they grew no crops, raised no livestock, mined no ore, cut no trees, took no fish from the sea, nor processed, manufactured, refined, packaged, or sold at retail any 'products' of their own." A list of famous international trading companies would include: United East India Company of Holland, British East India Company and Hudson's Bay Company.

A close reading of the title and emergency clause of Article 1527 as originally enacted[57] compels the conclusion that the Legislature contemplated the creation of precisely the type of trading company described above. The title of the original Act provides: ". . . An Act to authorize the creation of international trading corporations in this state under the general corporation laws of the state which will authorize such corporations to engage in business of international trading, trading the products of the farm, ranch, orchard, mine and forest, and engage in the sale of same to foreign countries . . ." The emergency clause indicates that the creation of such corporations was absolutely necessary in the interest of farmers, ranchers, and others engaged in the business of producing raw materials. The Legislature was seeking to insure that the vast quantity of raw materials then in the hands of Texas producers found an adequate market.[58]

Nowhere in the statute is there any intimation that the Legislature anticipated the creation of companies that would produce raw materials and then trade them on an international basis. The concern was purely with marketing what was apparently a surplus of raw materials already being produced in Texas. Article 1527 was enacted for the specific purpose of authorizing the creation of "international trading companies" in the historical sense of that term, nothing more and nothing less.

Texasgulf does not in reality even remotely resemble the type of company the Legislature had in mind when Article 1527 was enacted. Today it is a huge multinational natural resources corporation with assets in Canada, the United States, Australia and other countries. The President of the company described it in this manner: "Texasgulf is a natural resources company and we are engaged in the purchase and sale and mining and finding and we are basically in-

---

57. Article 1527 is a derivation of Vernon's Civ. Stat.Supp.1922, Articles 14⅞, 14⅞a and 14⅞b. These Articles were the codification of Acts 1921, 37 Leg.Ch. 120, P. 227, §§ 1, 2 & 3.

58. The emergency clause reads as follows:
"The fact there is now no adequate law in Texas, authorizing the creation of international trading corporations, and the further fact that it is absolutely necessary in the interest of the farmers, the ranchmen, and others engaged in the business of producing raw materials in the State of Texas that such corporations be created and brought into existence so that the vast quantity of raw materials now in the hands of the producers of the State of Texas find an adequate market, creates an emergency and imperative public necessity requiring that the Constitutional rule which provides that bills be read for three successive days shall be suspended, and the same is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted."

volved in finding, developing exploration, development and production of natural resources and in the purchase and sale of natural resources. We are a company that mines and produces all of the products mentioned, sulphur, potash, phosphate, copper, lead, zinc—you have heard the list of products. We trade, buy, swap. We do a lot of things." Texasgulf does participate in all of these activities, but its primary role is that of a *producer*. As stated in its annual report it is basically engaged in "finding, developing, mining, processing, and marketing natural resources." Dr. Yeager, the affiant, further states that Texasgulf is primarily a producer as opposed to a trader of natural resources. "I have carefully reviewed its 1972 annual report. It is my opinion as a economist that Texasgulf, Inc. is a producer of natural resources, with emphasis in solid mineral, such as sulphur, copper, silver, zinc and iron. The fact that, like many producers, it sells and swaps its products on the international market does not, in my opinion, place it in the category of international trading companies."

Texasgulf was clearly not originally chartered as an international trading corporation. It was chartered in 1909, twelve years prior to the enactment of what eventually was to become Article 1527, as a Texas corporation formed for the purpose of establishment and maintenance of an oil company.[59] This purpose clause remained unchanged until 1963 when the shareholders of Texasgulf adopted certain amendments to the Articles of Incorporation, including Article II, the purpose clause. These amendments were filed with the Secretary of State pursuant to the provisions of Article 4.04 of the Texas Business Corpora-

tion Act on April 30, 1963. The purpose clause now reads as follows:

"The purposes for which the Company is formed are to engage in the integrated business of prospecting for, acquiring, developing, producing, mining, processing, beneficiating, concentrating, refining, manufacturing, transporting, selling and marketing sulphur, petroleum, oil, gas, other hydrocarbons, potash, phosphates, sulphates, sulphuric and other acids and substances, nitrates, nitrogen, lead, zinc, copper and all other minerals and metals and derivatives and byproducts thereof whether similar or dissimilar and not limited to those enumerated; to process, combine, change the form of, manufacture and perform all other acts necessary or desirable to convert such minerals and metals, derivatives, by-products and other required materials into fabricated products, agricultural and other chemicals and substances, in bulk and completely packaged and ready for consumption and use and to market same at wholesale or retail directly or through marketing and distribution channels; to acquire lands, leases, minerals and metals in place and mineral estates or other property interests necessary or desirable for such purposes; to construct or otherwise acquire and operate all buildings, machinery, plants and all other equipment needed or convenient for all such operations; to acquire, develop, hold and utilize patents and patent rights, licenses, trademarks and trade names useful in connection with any business of the Company; and to have and exercise all powers necessary or appropriate to effect any or all of the purposes for

---

59. Article II of the original charter of Texasgulf states:

"This association is formed for the purpose of establishment and maintenance of an oil company with authority to contract for the lease and purchase of the right to prospect for, develop and use coal and other minerals and petroleum; and in particular petroleum, sulphur and gas. Also with authority to erect, building and own all necessary oil tanks,

cars and pipes necessary for the foregoing purposes and to sell and otherwise lawfully dispose of said petroleum, sulphur and gas and other products. Also to acquire and dispose of such lands as are necessary or incident to the foregoing purposes, and, generally, to do and perform all things authorized by subdivision 3a Article 642. Revised Statutes of Texas as amended."

which the Company is organized, provided, however, that the Company shall not engage directly in the oil pipeline business in the State of Texas."

Texasgulf suggests that regardless of whether Texasgulf is the type of company the Legislature had in mind when Article 1527 was promulgated, the 1963 amendment to the general purpose clause triggered the application of this statute. The argument, in essence, is that the broad general purpose clause somehow authorizes "international trading" and that Texasgulf is therefore an Article 1527 international trading company.

This issue of whether a corporation is or is not subject to Article 1527 could not have arisen prior to 1955. Prior to that date a corporation could be organized for only one specific purpose. The only means by which a corporation could come within the ambit of Article 1527 was by adopting as its purpose clause subdivision 79 of Article 1302—the international trading company subdivision. In 1955 the Texas Business Corporation Act was adopted permitting Texas corporations to be organized for more than one specific purpose and generally to permit them to transact business in Texas in accordance with any one or more of its purposes. Texasgulf's theory is that any corporation which files a broad general purpose clause pursuant to the 1955 revision, which includes a provision which could possibly be construed to include the trading of natural resources is automatically subject to Article 1527.

This Court cannot agree. As previously stated this statute was designed to deal with a specific type of corporation. It is obvious from its legislative history that it is a special statute applicable only to that species of business enterprise. The 1955 revision which permits the chartering of multipurpose corporations does not broaden the scope of Article 1527. The authors of the Texas Business Corporations Act took great care to insure that Article 1527 was not repealed but in doing so they underscored the nature of that statute as a special provision pertinent only to a particular type or kind of corporation.

Article 9.15 provides in pertinent part:

"B. except as provided in Section B of Article 9.16 of this Act, any particular limitations, obligations, liabilities, and powers, *applicable to a particular kind of corporation for which special provision is made by the laws of this State,* including, (but not excluding other corporations) those corporations subject to supervision under Article 1524A of the Revised Civil Statutes of Texas, shall continue to be applicable to any such corporation, and this Act is not intended to repeal and does not repeal the statutory provisions providing for the special limitations, obligations, liabilities, and powers." (emphasis added).

The comment of the Bar Committee accompanying Article 9.15 elaborates further:

". . . there are a number of laws affecting corporations, which will be in no way affected by this new Act. *These are the special statutes applicable to particular types of corporations.* Under the usual rules of statutory construction, such special statutes would *not* be repealed by a subsequent general statute such as the new Act, and Section B of Article 9.15 expressly states that such a repeal is not intended. (emphasis added).

It might be conceivably possible for a producing corporation such as Texasgulf to come within the ambit of Article 1527 if it had a general purpose clause which expressly included international trading —although there is nothing in the history of Article 1527 to indicate that it applies to anything other than "traditional" international trading companies. But that issue is not present here. Texasgulf's amended charter contains nothing which indicates that it wished to participate in the type of business covered by Article 1527. Absent some ascertainable reference to international trading in its corporate charter, this

Court cannot conclude that Texasgulf, which is a producer having none of the attributes of the traditional trading corporation, is subject to Article 1527. To hold that it is would be a gross distortion of Legislative intent.

So much of law is simply common sense, and Texasgulf's argument falls short in that area. This Court finds it inconceivable that with the advent of the multi-purpose corporate "purpose" clause in 1955,[60] Article 1527 became a lurking monster applicable to any corporation which might draw a purpose clause broad enough to include international trading in the products of mines —or the farm, ranch, or forest for that matter. In addition to being contrary to the rational underlying Article 1527, the net effect of such a conclusion would militate against one of the purposes of the Texas Business Corporations Act— to make Texas an attractive state in which to incorporate.[61]

CDC further contends that even if Texasgulf were an international trading company within the meaning of Article 1527, that statute still could not serve as the basis for the issuance of a preliminary injunction. In support of that contention CDC relies *inter alia* on the following arguments:

1. Under the principles of equity, both the doctrines of estoppel and "clean hands," Texasgulf should not be permitted to invoke the protection of a statute which it has continuously violated. The reference here is to statutory provision which requires that a majority of officers and directors be Texas citizens, a provision which Texasgulf has been and is currently violating;

2. The "control provision" in Article 1527 has likely been repealed by Article 166a which provides: "Aliens shall have and enjoy in this state such rights as to real and personal property as are or shall be accorded to citizens of the United States."

3. The control provision is unconstitutional because:

(a) It is in contravention of the Fourteenth Amendment rights of aliens

(b) It conflicts with the Convention as to Tenure and Disposition of Real and Personal Property of 1900. This Convention, originally between the United States and Great Britain became applicable to Canada through a Supplemental Convention signed in 1922

(c) It limits or impairs the free flow of interstate and foreign commerce

(d) It violates the due process and equal protection rights of shareholders in that it permits the unilateral cancellation of the corporate charter, without notice or hearing, by the Secretary of State.

4. The control provision would be violated only if aliens would, as a result of this tender offer, hold a majority of the outstanding stock of Texasgulf. Due to the heavy trading in this stock between Canadian and United States citizens, it would be impossible to determine at this time what percentage of shares is owned by persons not citizens of the United States.

It is not necessary to discuss these arguments since it has previously been concluded that Texasgulf is not subject to Article 1527. They are recited here merely to illustrate the serious hurdles which would have to be cleared before Article 1527 could pose a real threat.

---

60. Texas Business Corporation Act, Article 2.01, subd. A provides in pertinent part:
 "Except as hereinafter in this Article excluded herefrom, corporations for profit may be organized under this Act for any lawful purpose or purposes . . . "

61. If Texasgulf's argument prevailed, there would be a flight of Texas Corporations to Delaware and other states, especially those Texas subsidiaries of many foreign-owned companies, a result not consistent with the purposes of the Texas Business Corporation Act. Final Brief for CDC at 62.

## CONFLICT OF INTEREST

Texasgulf is also seeking an injunction on the ground of what it broadly categorizes as an "inherent conflict of interest." The argument here is essentially three-fold. First, it is contended that CDC, should it become a controlling shareholder of Texasgulf, would be unable to adequately discharge its duty to make business decisions in the best interest of Texasgulf and its non-Canadian shareholders. This alleged infirmity, according to Texasgulf, is due primarily to a provision in the Canada Development Corporation Act which states that one of the "objects" of CDC is to "assist in the creation or development of businesses, resources, properties, and industries of Canada." Second, Texasgulf insists that this objective would make it impossible for CDC directors, who might also become directors of Texasgulf, to fulfill the fiduciary duty that they would owe to Texasgulf. Third, Texasgulf contends that since CDC is presently wholly-owned by the Canadian government, it would in effect be dealing with itself when obtaining mineral and petroleum concessions from the government—a position which could lead CDC to sacrifice the interests of Texasgulf to the detriment of the shareholders of Texasgulf. In sum Texasgulf's contention is that CDC is required to pursue the nationalistic goals of Canada, a requirement which could work to the detriment of Texasgulf's holdings in other parts of the world and to the corporation's profit picture in general.

A great deal of evidence has been presented on this point by both sides. Most of it goes to the strength, or binding nature of the objective quoted above.

Mr. Harold Anthony Hampson, currently President of CDC and formerly Chairman of the Board, denies that there will be a conflict of interest problem of any magnitude. Emphasizing the phrase which immediately follows the list of CDC "objects" . . . "and shall be carried out in anticipation of a profit and in the best interests of the shareholders as a whole," [62] Hampson sees nothing which would require CDC to pursue the goals of the Canadian Government to the detriment of Texasgulf. He further stated, along with Mr. Crowe, CDC's current Board Chairman, that should he become a Director of Texasgulf, he knows of no limitation in CDC's charter or otherwise which would prevent him from discharging his duty to seek a maximum profit for Texasgulf, commensurate with sound business practices. In his view the interests of Texasgulf and CDC will coincide. CDC as a profit oriented business enterprise and a holder of 35% of Texasgulf's outstanding stock would have no reason according to Hampson, to take action adverse to Texasgulf's overall profit potential. Hampson also assured the Court that the views of the other officers and Directors of CDC were consistent with his own.

Texasgulf, on the other hand, offered an expert witness, Ivan Reid Feltham, a professor of law at the Osgood-Hall Law School of York University in Toronto, who was of exactly the opposite opinion. He testified that in his opinion based on his familiarity with the statute and its legislative history, CDC would be bound at all times to give priority to and emphasize industrial development in Canada. The gist of his testimony is reproduced below.[63] Dr. Fogarty, Texasgulf's

---

62. *Supra*, at 4, 5.

63. Record at 727, 728, 729, 733 & 734:
"Q. Now, Mr. Feltham, if you would, please, taking into consideration your knowledge of the act and its objects, will you tell the Court whether you have an opinion as to whether the act imposes any constraints or restrictions upon representatives of CDC who would attempt to sit upon the board of Tex-

asgulf, assuming the tender offer was successful?
"A. I think I must respond in two states, sir, to that question.
"First, I direct myself to the act itself which is a statutory charter for the corporation which the directors of the corporation must obey. I interpret the act, and specifically the objects of the incorporation to require that the directs of the Canada

President, and Mr. Alex E. Barron, the only Canadian on the present Board of Texasgulf, were also of the opinion that the objective poses a serious conflict of interest problem. Their opinions do not differ in substance from that expressed by Feltham. They did however express specific concerns that CDC might spin-off certain Texasgulf holdings in the United States in order to pay the interest on CDC's loan currently outstanding from the Toronto-Dominion Bank, and that should employment cutbacks become necessary at Texasgulf, CDC would be under pressure to favor saving jobs in Canada and dispensing with jobs in the United States.

This Court is inclined to agree that CDC, should it become a controlling shareholder of Texasgulf, might possibly be faced with conflict of interest prob-lems at some future point in time. But problems of this nature are not peculiar to this particular situation. The directors of many multinational corporations are presented with very similar conflicts on a daily basis. For example, any highly patriotic and nationalistic citizen of Canada sitting on the board of a multinational corporation might be torn between what is best for his country and what is best for his company each time a decision is made which might have an adverse effect on the economy of his nation. This Court fails to see how the general objective, of which so much has been made, makes the conflict materially more acute. This is especially true in light of the admonition that the objectives of CDC are to be carried out in anticipation of profit and in the best interest of shareholders as a whole. The Act

---

Development Corporation at all times give priority to and emphasize industrial development in Canada.

"It follows from that, in my interpretation of the act, that those directors must also require any nominees on the board of a company in which they have acquired or will acquire an interest to further the objectives of the Canada Development Corporation. Otherwise, within the framework of the act, it would seem to me to be beyond the proper power of the Canada Development Corporation to make the investment in the first place.

"In other words, Your Honor, if it's not their intention to, by the investment, further the objectives of the Canada Development Corporation as set out in the statute, then it seems to me that that is clearly as a matter of law beyond their power. That would therefore imposed upon any directors whom they caused through one way or another to be elected to the board of Texasgulf, the constraint of serving the objectives of the Canada Development Corporation.

"If in the eventuality the directors appointed to the board are elected to the board of Texasgulf happen to be directors of the Canada Development Corporation, it would seem to me that those individuals would themselves be subject to that specific constraint in a very direct way as directors or officers if they happen to be officers and not directors of the Canada Development Corporation.

"If the eventuality were that the nominees put forward by Canada Development Corporation as a shareholder of Texasgulf were neither officers or directors of the Canada Development Corporation, it seems to me those still, as a matter of law, looking at the Canada Development Corporation Act, that the duty would lie upon the officers and directors of Canada Development Corporation to use their best efforts through whatever devices they may have to influence those men or women to exercise their power as nominees of the Canada Development Corporation as a shareholder of Texasgulf to further the objectives of Canada Development Corporation."

In response to a question as to what portions of the statute form a basis for his conclusions Mr. Feltham stated:

"A. Confining myself, sir, just to the Statute, I rely on my interpretation of Section 6, the objects of the company, and in particular the four subclauses set out there, all of which summarizing briefly, refer to some aspect of Canadian interest.

"For example, the first clause talks about the creation or development of business resources, properties and industry of Canada. And this theme is carried forward throughout that section of Statute that is the heart of the company's charter with regard to its objects, and therefore the framework within which it must operate.

"That's supported by the, as I stated before, the title of the Statute, the general statements of the purpose of the Act, and the other supporting sections which relate to the investment by the government of Canada and its continuing interest in the corporation.

"Even on the face of the Statute, one must assume, I think, that the responsibility of the government in making a major investment in such a corporation is to do so only for the purpose of national development."

merely instructs CDC's Directors to keep the development of Canada in mind while operating the company as any other company is operated—for a profit. This is hardly more than one would expect from any Canadian citizen concerned with the economic welfare of his homeland.

The divided loyalty problem is a familiar one to the courts of this country and adequate machinery has been provided for protecting the interest of minority shareholders. A potential conflict of interest problem is present in every case where two separate corporate entities have interlocking directorates, yet no one has suggested that this sort of relationship be prohibited. It is simply a fact of life in the modern business world. If at any time Texasgulf shareholders feel that CDC as a controlling shareholder is not discharging its duty of loyalty to Texasgulf,[64] or that CDC appointed directors are breaching their fiduciary obligation,[65] they have a well recognized remedy under Texas law in the form of a shareholders derivative action.[66] The question of CDC's dealing with itself to the detriment of Texasgulf in obtaining mineral and petroleum concessions from the Canadian Government, is subject to the same response. An adequate remedy is provided if CDC does in fact compromise the interests of Texasgulf. Further, it might be added that the risk of this problem arising, if indeed it is a problem at all, will be substantially reduced in the near future. The Canada Development Corporation Act envisions that 90% of CDC's stock will eventually be publicly held, and Hampson assured this Court that a move in this direction is imminent.

 As a matter of law, Texasgulf has not met the prerequisites for the issuance of a preliminary injunction on the "conflict of interest" issue. Texasgulf has failed to make a clear showing of either (1) probable success on the merits *and* possible irreparable injury *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. The question of whether CDC should have disclosed this potential conflict of interest in its tender offer is treated later in this Opinion.

The Court is aware that the issue of a possible conflict of interest also must be considered in a larger and broader context of public policy and national interest. That is, what should our national policy be in protecting the national interest of the American people from a real or an imaginary threat of the multinational corporation, regardless if it is a private foreign corporation or one that is ostensibly a private corporation but nevertheless is an instrument, directly or indirectly, of a foreign nation-state, such as the Japanese corporations who are now buying tracts of timber land and cotton fields in this country, or one such as CDC (which will sell to the Canadian public all but 10% of its common stock in the near future) and British Petroleum which is almost 50% owned by the Government of Great Britain and has recently been reported to want to increase their ownership of Standard Oil of Ohio from a 25% interest to a 50% interest.

It seems to this Court that if the threat is real, it makes little difference if the foreign multinational is government owed and controlled or not. If it is government controlled, at least we will know "our enemy" and to whom it owes

64. Morrison v. St. Anthony Hotel, 295 S.W. 2d 246 (Tex.Civ.App.1965, writ ref'd n. r. e.)

65. "The responsibility of the corporate fiduciary includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation." International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567 (Tex.

1963); Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955).

66. This remedy was recognized in Texas as early as 1880. Evans v. Brandon, 53 Tex. 56 (1880). See also Robinson v. Bradley, 141 S.W.2d 425 (Tex.Civ.App.1940).

this allegiance, and through diplomacy and treaties could balance their political influence and their economic power. But the private multinational corporation has no allegiance except to itself and its management who alone knows what it does. It has been accused of producing where labor is cheap, paying taxes where taxes are low and selling where the price is right. With their great quantities of liquid assets and resources, they are now able by transferring funds from one currency to another to frustrate government policies, and change the value of a currency. Because the U.S. multinationals can in effect export jobs and have been accused of doing so, there is little wonder that members of Congress are beginning to feel the pressure of organized labor.

But this coin of international finance has another side and that is that many believe that these multinationals are the answer to some of the historical evils of nationalism. It will probably be the multinational that will pierce the Iron Curtain and open China's door; not with force of arms but with the salesman, engineer and businessman. Perhaps these defenders of the multinationals are correct; that the entire world will benefit from an economic integration.

Be that as it may, we must realize that it is our multinationals who are the real giants—ITT, Xerox, Standard Oil, General Motors, Singer, Goodyear, IBM, Colgate-Palmolive, National Cash Register, Eastman Kodak, Minnesota Mining and Manufacturing, International Harvester, and many others.

Should we expect to operate freely around the world and exclude a foreign corporation such as CDC?

The answer of this Court *in this case* is no. This particular acquisition is not a threat to the U.S. In fact, it might be, that if their acquisition is thwarted, our long time friend, neighbor and ally, who we all know is now experiencing an increasing feeling of economic nationalism, might look to other methods of expressing this growing sense of economic nationalism.

It is an issue of public policy and national interest as to the role multinationals will play in the future, but this Court cannot decide generally in the context of this case what this role may be. It belongs in the Legislature and Executive Branches of government. This broad issue is too fraught with economic subtleties and questions of delicate balances of trade, as well as problems of economic reciprocity. Remember, turn about is fair play.

Suffice to say this case is not the vehicle to wander into this bog of uncertainty.

Of course, what makes this problem so pertinent now is the constant and continuous devaluation of the U.S. dollar, the depressed stock prices of many U.S. companies and the long period of unfavorable balances of trade. These factors emphasize and multiply this whole issue.

There are many good buys today in the U.S. by foreign held American dollars as well as by foreign currencies. This acquisition, eventually successful or not, will not be the last one and especially from Canada where it is said that the U.S. controls 60% of their mining industry and 80% of their smelting and refining capacity. The CDC emphasizes that this acquisition would help our balance of trade to the extent of $290,000,000.

How can a court of law or equity even consider a problem so complex, hard and difficult? Only the Congress or the Executive Branch has the resources to determine what is in the best interest of this country in the increasing problems of multinationals.[67]

---

67. Legislation in this area is presently before Congress. H.R. 8951, 93d Congress, 1st Session (Also known as the Dent Bill), which has been referred to the Committee on International state and Foreign Commerce, would restrict foreign ownership of the shares of a corporation registered under the Securities and Exchange Act of 1934.

Especially is this true today in a time of declining and depleted national resources. We are told we have an energy crisis. We know that most of the U.S. oil that is consumed here is from the Western Hemisphere. Suppose we begin to depend upon oil from the Middle East as many now predict. It is not too speculative to realize that in the near future when a super tanker from the Middle East discharges millions of barrels of oil on the East or Gulf Coast for our refineries there will be flying overhead a 747 loaded with an equal amount of American dollars that could be used to buy newspapers, TV and radio stations and public relations firms, to influence our foreign policy in the Middle East. No, this Court is inadequate to decide these far reaching problems that are presented by the exceedingly rapid increase in the multinationals and the consequences of their being.

■ But this Court can and does decide *this case* and holds that this particular acquisition of Texasgulf by CDC is not contrary to the public policy of the United States nor against the national interest.

### DISCLOSURE UNDER THE WILLIAMS ACT

■ The statute of greatest importance to this litigation and to which this Court has previously referred, and the one which seeks to offer some control of these tender offer bids is known as the Williams Act. This Act is Sections 14(d) and 14(e) of the Securities and Exchange Act and was enacted as amendments to that Act on July 29, 1968. The Williams Act was designed to guarantee to the shareholders to whom the offer was directed and to the public in general that they would have sufficient information about the tender offer—both from the offeror and from management of the target company—to

be able to make an informed investment decision. As stated by Senator Williams:

"The measure is not aimed at obstrucing legitimate takeover bids. In some instances a change in management will prove a welcome boon for shareholder(s) . . . and . . . it may be necessary if the company is to survive. I have taken extreme caution with this legislation to balance the scales equally to protect . . . corporation, management, and shareholders . . . Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offeror and management equal opportunity to fairly present their case." 113 Cong. Rec. 854-855.

The mechanism it uses to accomplish these goals is to require the offeror to file specified information at the time the offer is commenced [68] and by mandating that the target company make similar disclosures should it choose to solicit or recommend to its shareholders either to accept or to reject the offer.[69]

■ In addition to regulating disclosure both with regard to the offeror and to those who might seek to influence the stockholders to accept or to reject the offer, the Williams Act makes it unlawful to disseminate any untrue or misleading information regarding tender offers regulated by the Act, or to engage in any fraudulent, deceptive or manipulative acts or practices in connection with the tender offer.[70]

Generally speaking, the standard for determining liability under Section 14(e) on the part of a person making a misleading tender offer, or a responsible officer of a corporation making such an

---

68. Section 14(d)(1), 15 U.S.C. § 78n(d)(1).

69. Section 14(d)(4), 15 U.S.C. § 78n(d)(4).

70. Section 14(e), 15 U.S.C. § 78n(e).

offer is whether the target company has established that the offeror

(1) Either knew the material facts that were misstated or omitted or

(2) Failed or refused to ascertain such facts when they were available to him or could have been discovered by him with reasonable effort.

Chris Craft Industries v. Bangor Punta, 480 F.2d 34, (C.A.2, 1973) as cited in Cauble v. White, 360 F.Supp. 1021, (E. D.La., June, 1973).

The materiality of the information turns on whether a reasonable "prototype" investor might have considered such information important in the making of his decision to tender or not to tender in response to the tender offer. Affiliated Ute Citizens v. United States, 406 U.S. 128, 154–155, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), Gulf and Western Industries, Inc. v. Great Atlantic and Pacific Tea Co., *supra.*

To be material a statement in a tender offer need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. Gulf & Western Industries, Inc. v. Great Atlantic and Pacific Tea Co., *supra,* Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973).

In addition, "Whether facts are material . . . when the facts relate to a particular event . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), as cited in Sonesta v. Wellington Associates, *supra.*

The Court is well aware of the tight wire those who make tender offers

and the target companies who respond must walk for clearly it could be just as great a violation of Section 14(e) to say too much as to say too little. Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075 (5 Cir. 1970).

What the Court must do is look at the information which Texasgulf alleges should have been disclosed in the light of the evidence and previous findings of this Court to determine if in fact the information should be disclosed.

At this juncture the Court feels compelled to stress that from the beginning of this litigation CDC has offered, without conceding any prior misconduct, to make any disclosure which the Court might deem appropriate. On August 7, 1973 prior to commencement of the hearing, CDC presented (and they were filed under seal) a specific proposed amended tender offer setting forth added disclosures based upon Texasgulf's various claims as expressed in the pleadings and in the discovery proceedings. CDC renewed its offer several times during the litigation and again at the close of their case proffered (under Court seal) an updated amended tender offer. The Court is convinced that these offers to amend made by CDC have been made at all times in good faith to meet the objections of Texasgulf's management, and to do equity in this case. The Court does not find that it is part of CDC's strategy or trial tactics, but a bona fide attempt to complete its business.

Texasgulf alleges that the tender offer is infirm because it fails to disclose the following information:

1. The identity of those acting in concert with CDC in making the tender offer.

2. The violation of Section 13(d) resulting from the failure of the alleged group to make the required filings with the SEC when their combined holdings exceeded 5% prior to the tender offer.

3. Probable antitrust violations which would result from the ac-

quisition of the Texasgulf stock by CDC itself and in conjunction with Noranda.

4. Probable violation of Art. 1527, Tex.Rev.Civ.Stat.

5. Inherent conflict of interest with respect to CDC's goals and best interests of Texasgulf.

6. Plans for management changes and possible spin-off of Canadian assets.

7. Adverse effects of CDC stock ownership on Texasgulf's Australian operations.

8. Probable ineligibility for OPIC, 22 U.S.C. 2191.

9. Violation of Federal Communications Act, 47 U.S.C. 310(a)(5).

In light of the Court's previous discussion and rulings in relation to the allegations of conspiracy, antitrust violations, Article 1527, and the conflict of interest we can quickly dispose of some of Texasgulf's allegations of violations of the disclosure requirements of the Williams Act. The Court has previously found that CDC alone is making the tender offer, and that there exists no group or conspiracy in violation of Section 14(e) of the Securities and Exchange Act. The Court has further found that no group acting in concert, holding together more than 5% of the outstanding shares of Texasgulf common stock exists now or did exist prior to the filing of the tender offer that would come within the scope of the filing requirements of Section 13(d). Thus with respect to these two points CDC has made no misstatement or omission in violation of the disclosure laws.

Likewise there has been no misstatement or omission of a material fact in relation to possible antitrust violations. The Court has found that the Plaintiff failed to show sufficient substantial questions with relation to the merits of the antitrust allegations to warrant the issuance of a preliminary injunction. The bulk of the antitrust allegations, as observed earlier, rest on the alleged conspiracy with Noranda which the Court has found to be non-existent. Thus

CDC has not misstated or omitted any facts with relation to Sherman and Clayton violations resulting from a CDC/Noranda acquisition of Texasgulf stock because CDC is acquiring Texasgulf alone. Furthermore, the allegations that CDC is a "potential competitor" in the market and thus should either enter the market "de novo" or by a "toehold" are so remote from the situations in which such theories have been applied that a reasonable prototype investor would only consider such information as so speculative as to be not important to his decision whether or not to tender.

The Court has held that Article 1527 would have no effect on Texasgulf as a result of the acquisition of stock by CDC. This particular allegation has been the subject of much discussion both in the parties' numerous briefs and in the courtroom. It has also received wide publicity in the press. Even though this Court feels that CDC's disclosures in the original tender offer were fully adequate, out of an abundance of caution and in light of the general attention this statute has received and the confusion which may exist in the prototype investor's mind in relation to it, this Court feels that it should now be disclosed in the tender offer as information which the reasonable investor might consider important in the making of his decision to tender. Especially is this appropriate inasmuch as CDC has suggested it.

The potential conflict of interest problem can be handled in a like manner. It is not sufficiently serious to require disclosure. But, since so much was made of it during this hearing, and since CDC has offered to do equity and acknowledge it in its amended tender offer, this Court will agree that it should be disclosed. A reasonable investor might now consider it relevant in reaching a final decision.

 As has been previously noted, Section 14(d) requires the offeror to file specified information as part of the offer. This information is the same as is required by Section 13(d) of the Act and includes a requirement that the of-

feror delineate "any plans or proposals which such person may have to liquidate such issuer [i. e. target company], to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure." Section 13(d), 15 U.S.C. 78m(d)(1)(C). Thus clearly an offeror is required to disclose any plans it has to sell or "spin-off" assets of the target company. Furthermore, it must disclose plans to take control of the target company or to participate extensively in its management. Susquehanna Corp. v. Pan American Sulphur Co., *supra,* 423 F.2d at 1082–1086.

Texasgulf maintains that CDC failed to comply with this section and with Section 14(e) by misstating its intentions with respect to the assets and management of Texasgulf in the tender offer. The portion of the tender offer in question states:

"The purpose of the transaction is to acquire a sufficient number of shares of common stock of the Company, which together with such shares of common stock now owned by Offeror, will be equivalent to approximately 35% of the outstanding common stock of the Company . . . While this will be less than a majority of the outstanding common stock of the Company it is believed that Offeror will have effective control. Offeror does not have any plans or proposals to liquidate the Company, to sell its assets or to merge it with any other company. Offeror cannot state at this time what changes it might seek to make in the management and business of the Company. It intends to review the situation and, if it acquires effective control of the Company, to make such changes as it deems in the best interest of the business of the Company . . . ."

Texasgulf claims this is misleading and in fact a misstatement of CDC's true intentions in that they really intend to spin-off non-Canadian assets and to change the management. In support of their contention Texasgulf relies on statements in the various memorandums presented to the CDC Board of Directors during the period from March through July prior to the tender offer. CDC maintains its statements in relation to assets and management were fully adequate in that they have no plans to spin-off assets of Texasgulf, and that they do not know what management changes will be made, if any, because that will depend on their evaluation of the situation and the events which transpire following consummation of the offer.

■ Certainly information regarding possible disposition of assets and management is material information which a reasonable prototype investor might consider important in making his decision. The Court is of the opinion that the statement in the tender offer made by CDC accurately reflects their plans with respect to spin-offs of assets, and management changes. It is clear to the Court from the various memorandums to the Board of Directors of CDC and minutes of their meetings that have been put into evidence, that during the time period from March, 1973 through May, CDC conscientiously studied Texasgulf from all possible angles to determine all the possible actions they could take or would need to take in relation to the company. When it came down to final decisions many of the ideas were rejected. For example, in the analyst's comprehensive study of Texasgulf dated May 22, 1973 made at the request of CDC's management [71] the possibility of selling off the Agricultural and Chemical Divisions of Texasgulf in order to finance expansion of Canadian operations was suggested because of their financial unpredictability. However, later memorandums from Hampson emphasized the financial attractiveness of the Chemical Division in particular.[72] Certainly CDC, being prudent businessmen, discussed the possibility of disposing of certain facets of Texasgulf's operation but this was pure discussion which never mater-

71. *Supra,* Note 21.

72. *Supra,* Note 19.

ialized into any kind of definite plans either to spin-off assets to concentrate on Canadian business or to spin them off as a means of paying off debts incurred in making the tender offer. The Court is of the opinion CDC's statement with respect to their plans for the assets of the target company fully and accurately reflects their position.

The discussions reflected in the various memorandums and minutes of meetings concerning management also indicate the wide range of options CDC considered. At one time early in CDC's evaluation of Texasgulf, the company's management was characterized as "weak and would need changing." [73]

But then at a later time it was noted that the company's poor financial performance was due to the market and not to internal weaknesses of the company.[74] The evidence further reflects, as we have previously observed, that at the time of the actual tender offer, just prior to the CDC officials meeting with the Texasgulf officials, Hampson on two occasions discussed with Woodfin his desire to reassure management at the meeting that CDC wanted them to remain. Hampson even suggested the possibility of offering them contracts. But Woodfin advised against any such actions because it might appear that CDC was attempting to buy the support of Texasgulf's management for the tender offer. Hampson took his advice. Of course, CDC had to be prepared for the contingency that management might resign and this was reflected in the final memorandum on the Texasgulf tender offer dated July 23, 1973. In short, the Court is convinced that the statement made in the tender offer by CDC concerning management accurately reflected CDC's attitude toward management. CDC had no present plans to change the management but had adopted a "wait and see" attitude to allow them time to study and evaluate the situation if they gained control. For CDC to have said more in relation to management in fact itself would have been misleading and would have been an untrue reflection of their plans on which the offeree or the public investor might have relied unjustifiably. See *Susquehanna,* supra, at 1085–1086.

Texasgulf next contends that CDC ownership of Texasgulf stock and possible control will jeopardize Texasgulf's interest in two Australian mining projects, one at Rhodes Ridge and the other at Marandoo, and that this information is material and should be disclosed in the tender offer. Both of these projects involve development of rich iron ore properties and are in the beginning stage. They are operated by wholly owned subsidiaries of Texasgulf, the Rhodes Mining Co. and the Marandoo Mining Co. Texasgulf, through its subsidiary, has a 50% interest in the Rhodes Ridge, Western Australia project, and is manager of the project pursuant to an agreement with Texasgulf's co-venturer, Hancock and Wright (Hanwright). The agreement between the parties contains a clause allowing the co-venturers to terminate the employment of the Manager (subsidiary company) if as a result of a tender offer there occurs a change in the direction management and policies of the parent company. The evidence indicates that the exercise of the clause is discretionary with the companies involved.[75]

---

73. Plaintiff's Exhibit 4, *supra,* P. 4.

74. *Supra,* Note 20.

75. Plaintiff's Exhibit 38, Affidavit of E. A. M. Wright of Hanwright:
 * * * * *
 "(6) Section 9.02 of the said Rhodes Ridge Management Agreement (in which RRM is referred to as 'Manager' and RRM and Hanwright are collectively referred to as 'the Participants') provides so far as material as follows:

'. . . the employment of the Manager pursuant to this Agreement shall terminate as provided in Section 7.01, or upon sixty (60) days notice of termination given by the Participants jointly or in the event any Participant is an Affiliate of the Manager, by Participants having a majority in interest of the aggregate share of the Participants other than such an affiliated participant, upon the happening of any of the following events.'

The Marondoo project is also a 50-50 joint venture of Hanwright and Marandoo Mining, a wholly owed subsidiary of Texasgulf. This project is still somewhat in the planning stages. The relevant Joint Venture Management and Parent Company agreements have been drafted on substantially the same basis as the Rhodes Ridge Agreement, and will be executed when all necessary Australian Government approvals have been obtained.

Significantly, the evidence indicates that while change in control of Texasgulf could result in their subsidiaries losing their management rights in the two projects, Texasgulf would not lose its investment. Furthermore, it is abundantly clear from the evidence that

CDC had no way of knowing this information on the basis of the public records and filings of Texasgulf. The investments were only generally discussed in the 1972 Texasgulf Annual Report in terms of production capabilities; nothing was mentioned about the management terms of the agreements.[76] They were given even less mention in the company's 10–K filing with the SEC where they were lumped with "other subsidiaries." [77] In fact, Texasgulf admitted that the only way CDC might have known about the possible adverse effects on the Australian projects would have been to go to Australia to examine the agreements or to hire an Australian attorney to do so.[78]

'(a) if as a result of a tender offer or proxy contest, as those terms are understood in the United States of America, the Person or Persons in control of any corporation which together with one or more of its subsidiaries, directly or indirectly owns outstanding shares of the Manager having under ordinary circumstances (not dependent upon the happening of a contingency) more than 50% of the voting power in the election of members of the board of directors of the Manager (such corporation and, except for this paragraph (a), any intermediate subsidiary thereof, is herein called the Manager's Parent Corporation), or any successor of such Parent Corporation, shall cease to be in control thereof; for the purposes of this Section 'control' shall mean the possession directly or indirectly of the power to direct or cause the direction of the management and policies of the Parent Corporation whether through ownership of voting shares, or through exercise of voting rights through proxies given by the owners of such shares, or by contract or otherwise.'

"Hanwright believes that under the said Section 9.02(a) they have the right to terminate the employment of RRM as Manager if as a result of a tender offer the persons now in control of the Direction management and policies of Texasgulf Inc. cease to be in control thereof."

76. Defendants' Exhibit 1, Texasgulf 1972 Annual Report, P. 17.

77. Defendants' Exhibit 14, Texasgulf's 10-K filed with SEC, March 27, 1973:

"Item 4. Parents and Subsidiaries
Texasgulf's only significant subsidiary is Ecstall Mining Limited, a Delaware corporation wholly owned by the Company. Ecstall Mining Limited is included in the Company's consolidated financial statements filed herewith. The Company's other subsidiaries, which are all included in the consolidated financial statements, considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary."

78. Record, at 513, 525–528:
\* \* \* \* \*
"Q If you are going to be fair on the disclosure question, woudn't you agree that if we disclosed the significant aspects of this company, 700 million dollar multinational, many asset company, that we have done all that's required of us and you wouldn't expect us to list every little asset of that large company in making a tender offer, would you?

"A I would have thought that you would have listed Australia and given it a little more preference and Marandoo and Rhodes Ridge because these have potential to become sizable mines, Mr. Hutcheson.

"Q Despite the fact that the public record which you filed said that all of the other subsidiaries except Ecstall put together would not constitute a significant subsidiary and in spite of the fact that you have admitted there is no way that we could have known about this possible change of control in the management contract?

"A You couldn't have known about the possible change of control problem unless you

The Court finds that information concerning the Australian ventures might be of importance to an investor making a decision on tendering his stock because the Australian projects are part of the future growth and income of the company and it might be to the company's advantage to have the management rights in order to increase the chances that they will be operated to the greatest profitability for Texasgulf. However, CDC could not reasonably have been expected to disclose this information because it was not available to them and could not have been discovered with reasonable effort since there was nothing in any of the public filings to inform CDC of this possible problem. Texasgulf suggests CDC should have inquired of Texasgulf about the projects, but this suggestion is unrealistic as it would have encouraged speculation that CDC was contemplating an offer. Texasgulf had never considered the information important enough to put in any of its public records, and CDC cannot be held responsible to disclose the contents of Texasgulf's private files. If anyone should have disclosed this information, it should have been Texasgulf.

> would have come to see us or made inquiry.
> It's available in Australia, sir, but you would have known that these were tremendously rich, important projects for the company's future."
>
> \* \* \* \* \*
>
> "Q Now, we were discussing at the close of Court on Friday the Australian problem as you see it relating particularly to the possible termination of the management contract on the Marandoo and Rhodes Ridge projects. Do you recall that testimony, generally?
> "A Yes, sir.
> "Q And I believe you testified that you had a signed management contract on Rhodes Ridge and you had what you consider a negotiated, but as yet unsigned contract from management on Marandoo. is that correct?
> "A That's correct.
> "Q And we were discussing what public information would be available to CDC or any other company interested in your company stock at the public filings which Texasgulf is required to make and does make. It is true, is it not, that in no public filing, to your knowledge, as president of the company, was there any statement about the value of the management contract or about the possible forfeiture of that contract if there should be a change in control?
> "A Well, the company per se didn't make any such filings or statements such as you've mentioned, but this information is available in Australia, and it would have seemed to me, it's so readily available that it would seem to me that someone engaged in this type of a tender offer or takeover attempt could have called an attorney in Australia and in a matter of a few days he could have put together a tremendous amount of information relative to this subject, sir.
>
> I think they could have looked at the signed documents that we have with the Australian government and they could have canvassed our partners there, and I think they could have found this out quite readily.
> "Q I see, sir.
> And in that connection, is that document public information over there, the management contract with your partners?
> "A It's all part of a large file of documents that we have signed and that are part of the government records, sir.
> "Q Well, all I'm asking is do you know of your own knowledge so as to testify to the Court that that information which anyone can reach if they want to in Australia?
> "A Yes, these iron ore agreements and these documents are public, and I'm told if anyone who wants them can obtain them.
> "Q Now, my question is whether that same information is available to members of the public in the United States?
> "A No, sir, in that detail, it is not.
> "Q All right, sir. I thought maybe you were suggesting I should go to Australia to get clear on it, Doctor, but I gather you mean now that somebody from Canada Development should have, in your opinion, gone there before they made this tender offer to see what they could find on this record about the management contract, is that correct?
> "A No, sir, I'm not suggesting that they go there, although it's a wonderful country to visit, I can assure you. I think they could have telephoned and found some attorney, corresponding attorney, if that's what you call them, someone in Australia who they could have engaged to investigate all of these various aspects of the iron ore arrangements.
> I really didn't mean to suggest that you should go there yourself, sir."

Therefore the Court finds that CDC's original tender offer was as complete as possible with respect to this issue. However, now that the information has come to light it should be put before the stockholders as an amendment to the tender offer for them to give it whatever weight they will.

Texasgulf maintains that the CDC acquisition of Texasgulf stock would render Texasgulf ineligible for the programs of the Overseas Private Investment Corporation (OPIC), 22 U.S.C. § 2191 et seq.[79] which are designed to encourage private investment in lesser developed foreign countries. The evidence indicates that at present Texasgulf does not have any programs operating under OPIC, but that it has filed letters of notice to be eligible for these benefits for projects in Senegal and Malagasy which are in the exploration stage,[80] and thus are not eligible for such programs.[81] Texasgulf alleges that Texasgulf would not be eligible for OPIC programs if effective control over the corporation could be exercised by non-U.S. persons. However, a close reading of the statute has convinced the Court that it is not

---

79. 22 U.S.C. § 2191 provides:

"To mobilize and facilitate the participation of United States private capital and skills in the economic and social progress of less developed friendly countries and areas, thereby complementing the development assistance objectives of the United States, there is hereby created the Overseas Private Investment Corporation (hereinafter called the 'Corporation'), which shall be an agency of the United States under the policy guidance of the Secretary of State.

In carrying out its purpose, the Corporation, utilizing broad criteria, shall undertake—

(a) to conduct its financing operations on a self-sustaining basis, taking into account the economic and financial soundness of projects and the availability of financing from other sources on appropriate terms;

(b) to utilize private credit and investment institutions and the Corporation's guaranty authority as the principal means of mobilizing capital investment funds;

(c) to broaden private participation and revolve its funds through selling its direct investments to to private investors whenever it can appropriately do so on satisfactory terms;

(d) to conduct its insurance operations with due regard to principles of risk management including, when appropriate, efforts to share its insurance risks;

(e) to utilize, to the maximum practicable extent consistent with the accomplishment of its purpose, the resources and skills of small business and to provide facilities to encourage its full participation in the programs of the Corporation;

(f) to encourage and support only those private investments in less developed friendly countries and areas which are sensitive and responsive to the special needs and requirements of their economies, and which contribute to the social and economic development of their people;

(g) to consider in the conduct of its operations the extent to which less developed coun-

try governments are receptive to private enterprise, domestic and foreign, and their willingness and ability to maintain conditions which enable private enterprise to make its full contribution to the development process;

(h) to foster private initiative and competition and discourage monopolistic practices;

(i) to further to the greatest degree possible, in a manner consistent with its goals, the balance-of-payments objectives of the United States;

(j) to conduct its activities in consonance with the activities of the agency primarily responsible for administering subchapter I of this chapter and the international trade, investment, and financial policies of the United States Government; and

(k) to advise and assist, within its field of competence, interested agencies of the United States and other organizations, both public and private, national and international, with respect to projects and programs relating to the development of private enterprise in less developed countries and areas."

80. Defendants' Exhibit 1, *Supra*, at P. 14.

81. 22 U.S.C. § 2194(d) provides:

"(d) to initiate and support through financial participation, incentive grant, or otherwise, and on such terms and conditions as the Corporation may determine, the identification, assessment, surveying and promotion of private investment opportunities, utilizing wherever feasible and effective the facilities of private organizations or private investors. *Provided, however,* That the Corporation shall not finance surveys to ascertain the existence, location, extent or quality, or to determine the feasibility of undertaking operations for mining or other extraction, of any deposit of ore, oil, gas, or other mineral. In carrying out this authority, the Corporation shall coordinate with such investment promotion activities as are carried out by the Department of Commerce.

completely certain that Texasgulf would be completely precluded from participation should CDC gain control. It should be pointed out that the statute itself is relatively new, having taken effect December 30, 1969 and on January 19, 1971 was by Executive Order No. 11579 deemed the successor of the Agency for International Development (AID).[82] The term "eligible investor" in the statute is defined as:

"(2) corporations, partnerships or other associations including nonprofit associations, created under the laws of the United States or any State or territory thereof and substantially beneficially owned by United States citizens . . . provided further, . . . a final determination of eligibility may be made at the time the insurance or [loan] guaranty is issued; in all other cases, the investor must be eligible at the time a claim arises as well as at the time the insurance or guaranty is issued."

22 U.S.C. § 2198(c).

Ownership of Texasgulf stock by CDC will not change Texasgulf's status as a corporation organized under the laws of the State of Texas. Thus its eligibility for OPIC will turn most likely on the interpretation given "substantially beneficially owned by United States citizens." Conceivably Texasgulf could already be barred from participation as a result of the 20% of its stock admittedly owned by Canadians prior to this offer.

■ The Court is of the opinion that CDC made no disclosure violation of Section 14(e) by failing to disclose the information relating to OPIC because its application to and effect on Texasgulf is basically an exercise in speculation since Texasgulf is not presently participating and in light of the proscription in the OPIC Act against aiding in the financing of exploration for natural resources. However, CDC has agreed to amend its tender offer to include this statute even though CDC is of the opinion, as is this Court, that it was not necessary to include it.

Texasgulf's final disclosure violation allegation concerns violations of the Federal Communications Act, 47 U.S.C. § 310,[83] which would occur if the tender

---

82. Executive Order No. 11579, Jan. 19, 1971, 36 F.R. 969 "Overseas Private Investment Corporation"
Section 4(b) provides:
"The Corporation shall be deemed to be the successor of the Agency for International Development and the Administrator thereof, with respect to all functions vested in the Corporation pursuant to law."

83. 47 U.S.C. § 310 provides:
"§ 310. Alien ownership as barring station license; assignment and transfer of construction permit or station license
(a) The station license required shall not be granted to or held by—
(1) Any alien or the representative of any alien;
(2) Any foreign government or the representative thereof;
(3) Any corporation organized under the laws of any foreign government;
(4) Any corporation of which any officer or director is an alien or of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign govment or representative thereof, or by any corporation organized under the laws of a foreign country;

(5) Any corporation directly or indirectly controlled by any other corporation of which any officer or more than one-fourth of the directors are aliens, or of which more than one-fourth of the capital stock is owned of record or voted, after June 1, 1935, by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or the revocation of such license.
Nothing in this subsection shall prevent the licensing of radio apparatus on board any vessel, aircraft, or other mobile station of the United States when the installation and use of such apparatus is required by Act of Congress or any treaty to which the United States is a party.
Notwithstanding paragraph (1) of this subsection, a license for a radio station on an aircraft may be granted to and held by a person who is an alien or a representative of an alien if such person holds a United States pilot certificate or a foreign aircraft pilot certificate which is valid in the United States on the basis of reciprocal agreements entered into with foreign governments.

offer were consummated. Specifically Plaintiff alleges that the statute prevents radio licenses to be held by corporations directly or indirectly controlled by a corporation one-fourth of the stock of which is held by aliens or an alien government and that further, no radio station licenses shall be transferred, assigned, or disposed of in any manner, directly or indirectly by transfer of control of any corporation holding a license except upon application to the FCC.

▇▇▇▇ A detailed reading of the statute makes it clear that this provision in the statute is discretionary. A corporation directly or indirectly controlled by a foreign corporation cannot hold a license "if the Commission finds that the public interest will be served by the refusal or revocation of such license." Thus the Commission is not operating under a mandate to revoke such a license. CDC has not yet violated the section of the statute dealing with transfer of control because they have not yet obtained even indirect control. Clearances from administrative agencies need not be secured prior to a final tender offer provided disclosure is made of the potential loss and its value in an amended tender offer. Ronson Corporation v. Liquifin Akiengesellschaft, 483 F.2d 846 (3d Cir. 1973).

▇▇▇ The Court finds that the information concerning the radio license under 47 U.S.C. § 310 is material and therefore should be disclosed along the guidelines from *Ronson* as set out above.

In summary, it is the conclusion of this Court that on the whole the tender offer as filed was a fully legal tender offer. Out of an abundance of caution

and at the suggestion of CDC the Court has held that certain further disclosures should be made to give the shareholders, who after all should be the ultimate decision makers as to ownership of the Texasgulf stock, the fullest information possible on which to base their decision. Therefore, as long as CDC amends its Schedule 13D and its tender offer and offers the Texasgulf shareholders who have already tendered a reasonable opportunity to withdraw on the basis of the additional disclosures, the Court will permit the offer to proceed and leave the ultimate decision of whether to tender to the shareholders. Ronson Corporation v. Liquifin Aktiengesellschaft, *supra*; Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973).

This Court held that the issues raised by Texasgulf of a conspiracy, a violation of Article 1527, possible antitrust violations, of a possible conflict of interest, and the possibility that this acquisition will be contrary to our public policy and national interest along with the alleged failures to disclose under the Williams Act, are all without merit. CDC has convinced the Court that it should prevail on all issues.

The Court further finds that it has jurisdiction of the parties and subject matter and that venue is proper under 28 U.S.C. § 1331(a) and § 1332(a)(2), Section 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa, and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.

The Court is aware that Texasgulf management will probably suffer some hardship as a result of this Court's deni-

---

(b) No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. Any such application shall be disposed of as if the proposed transferee or assignee were making ap-

plication under section 308 of this title for the permit or license in question; but in acting thereon the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee. June 19, 1934, c. 652, Title III § 310, 48 Stat. 1086; July 16, 1952, c. 879, § 8, 66 Stat. 716; Aug. 28, 1958, Pub. L. 85–817, § 2, 72 Stat. 981."

al of a preliminary injunction. Some Directors will probably be replaced. It is difficult to predict at this time the fate of Stephens and Fogarty. The original plan was apparently to keep both because their knowledge and expertise was needed. The tender offer stated that at that time it could not predict what changes in the management might be necessary. During the trial Hampson did not seem to be anxious to replace either Stephens or Fogarty even though he resented some of the allegations made by Texasgulf.

Texasgulf's arguments as to the harm that will be visited upon the non-tendering shareholders are predicated on the assumption that the tender offer is unlawful. This Court has held that it is a *lawful* tender offer.

Indeed non-tendering shareholders are more likely to be benefited than harmed. When this tender offer is consummated one-third of Texasgulf's shares will be removed from the active market. This probably will have a bullish effect on the market for the remaining shares since Texasgulf is a highly traded stock. Of course, the Court realizes that many other unpredictable factors affect the price of shares.

As to the fears expressed by Texasgulf as to the dire consequences which will result from their denial of the preliminary injunction, the answer is that this Court finds that Texasgulf has failed to make a clear showing of either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation.

Again, the Court feels that it is appropriate to state that it appreciates the position of CDC in volunteering throughout the trial, even though it is convinced that its original tender offer was good, to amend its tender offer out of a sense of fairness and compulsion to do equity. Also, the Court appreciates the offer of CDC to consent to an injunction on the antitrust issue, not because it feels it is required by the facts

or law, but simply to convince the shareholders and the public that CDC has nothing to hide in view of all the accusations Texasgulf has made against it.

The Court can see no harm or prejudice to any of the parties or shareholders in approaching some of the problems this way. The Court is convinced that all CDC wants is to let the informed shareholders make their decision in the democratic market.

It might be that now, after this lengthy hearing, that Texasgulf's shareholders are about as informed on the matters that should be disclosed as any shareholders have ever been in a tender offer case. Especially is this true when so many newspapers and magazines have carried one or more accounts of this trial. The Canadian newspapers naturally have followed the trial; Newsweek and Time had had stories concerning it; The Washington Post, The Wall Street Journal, and The Christian Science Monitor have mentioned it one or more times. Even the London Economist thought it was newsworthy.

In denying Texasgulf's request for a temporary injunction it is not necessary at this time to rule on CDC's claims.

It is obvious from the above that the Court has accepted CDC's version of the facts and their theory of the case. It has been a long trial. The transcript of the evidence consists of 1,937 pages. Sixteen briefs and proposed findings were filed with the Court. The Court received 132 exhibits in evidence. There were numerous conferences in chambers with counsel.

Counsel had a large number of attorneys working in and out of the courtroom during the trial. They had the benefit and help of the resources of their clients. It seems to the Court that they have brought to the Court all the facts and laws relevant to this case during the last thirty days.

We have delayed too long. The temporary restraining order should have been dissolved weeks ago. Texasgulf

has bought itself more time than was needed.

It is now time for the shareholders to decide in the democratic market place if they want to tender their shares for $29.00 and for those who have already tendered them to decide if, in light of this opinion, they wish to withdraw their tenders.

This Memorandum constitutes the Findings of Fact and Conclusions of Law of this Court and to the extent that any of the foregoing findings of fact constitute conclusions of law, they are adopted as such; to the extent that any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

Although the Court feels that the original tender offer and Schedule 13D were lawful and adequate in every respect when they were made, and that they contained all the material information necessary on which a reasonable "prototype" investor could base a knowing and informed decision to tender, the Court now believes that because CDC has volunteered and offered to make certain amendments in order that issues raised at the trial which might tend to confuse the investing public and the common stock shareholders of Texasgulf might be clarified, the Court will so order the amendments be made. Also, the Court acknowledges CDC's concern that the public realize that CDC is and has been acting in good faith and wants to do equity.

Therefore, the Court will allow CDC to amend its tender offer and Schedule 13D along the lines suggested in the sealed offer to Texasgulf and to the Court or in any other manner that CDC feels will better inform the investing public and holders of Texasgulf's shares of common stock, consistent with this opinion and specifically with respect to Article 1527, the conflict of interest allegations, the Australian mining projects, the Overseas Private Investment Corporation and the Federal Communications Act.

Therefore, it is ordered: that no later than seventy-two (72) hours from the issuance of this Opinion CDC file an amended Schedule 13D and tender offer consistent with this Opinion and offer the Texasgulf shareholders who have already tendered a reasonable time period to withdraw on the basis of the additional disclosures, and that no later than twenty-four (24) hours prior to this filing, CDC will file with this Court the proposed Schedule 13D and tender offer for the Court's inspection and approval. A copy will be furnished counsel for Texasgulf.

CDC, while disclaiming any violation of the antitrust laws of the United States and denying any intent to do so, and the Court agreeing, has previously indicated its willingness, in a sealed offer to Texasgulf and the Court, to consent to being enjoined from violating the antitrust laws of the United States. Although the findings of the Court on antitrust make it abundantly clear that this Court is of the opinion that no violation of the antitrust laws has occurred or will occur as a result of the consummation of this tender offer, because CDC is anxious and willing to do equity and because they want to insure themselves from any potential lawsuits, the Court will allow them to be so enjoined.

On Tuesday, September 4, 1973, the Court extended the Temporary Restraining Order for another ten days. The Court took this action reluctantly because it recognizes the hardship this extension inflicts on the shareholders who have tendered 10,350,000 (as of 1:00 P.M., CDT, September 4, 1973) shares in that they have been unable to negotiate their shares, or to receive the money due them from those shares. This extension, however, will give CDC time to file its amended Schedule 13D and tender offer, and it will also give Texasgulf time to apply to the Court of Appeals for a stay of this Order and Judgment. Because this Court has given careful thought and consideration to this case, it will not further extend the temporary re-

straining order or stay the Judgment in this case.

Since the parties have provided the Court with a transcript of the testimony and have both filed exhaustive briefs, the present temporary restraining order will afford Texasgulf more than sufficient time to file with the Court of Appeals any petition for relief they might seek.

Defendant CDC's Motion to Dismiss individually named Defendants, Hampson and Crowe, will be considered by the Court at a later date.

It is the opinion of the Court that the motion of the Plaintiff, Texasgulf, for preliminary injunction should be denied in all respects.

It is further ordered that the Defendant, CDC, prepare immediately a judgment, consistent with this opinion, including an injunction enjoining the Defendant from violating the antitrust laws, and, after exhibiting it to Plaintiff, Texasgulf, for approval as to form, submit it to the Court, without delay in light of the requirement of Section 14(d)(5) of the Securities and Exchange Act, 15 U.S.C. § 78n(d)(5), that upon expiration of sixty days from the date of the original tender, shareholders who tendered may withdraw their shares unless theretofore purchased by the offeror, for its consideration.

The Clerk will file this Memorandum Opinion and Order and furnish counsel for all parties with true copies.

## APPENDIX A

### Offer to Purchase for Cash

### 10,000,000 Shares of Common Stock

of

### TEXASGULF INC.

### at $29 (U. S.) per Share (Net)

by

### CANADA DEVELOPMENT CORPORATION

### Scheduled to Expire on August 10, 1973, Unless Extended

*To the Holders of Common Stock of*
TEXASGULF INC. *other than residents of Canada:*

CANADA DEVELOPMENT CORPORATION (the "Offeror"), a Canadian corporation wholly-owned by the Government of Canada, hereby offers to purchase 10,000,000 outstanding shares of the Common Stock, without nominal or par value (the "Common Stock"), of TEXASGULF INC. (the "Company") at $29.00 * per share net, in cash, upon the terms and conditions set forth herein and in the related Letter of Tender. Such number of shares constitutes approximately 32.5% of the total number of shares of Common Stock of the Company outstanding on March 31, 1973.

This Offer is not being made to any shareholders of the Company who are residents of Canada. Accordingly, no shares will be purchased hereunder from any shareholder if the information contained in the

---

*All references to dollars herein are to United States Dollars unless otherwise noted.*

Letter of Tender submitted by such shareholder indicates that such shareholder is a Canadian resident.

1. **Number of Shares.** The Offeror will purchase all shares of Common Stock tendered on or prior to August 10, 1973 up to 10,000,000 shares. If more than 10,000,000 shares are validly tendered, the Offeror will purchase at least 10,000,000 shares and may elect to purchase all or part of the shares tendered in excess of 10,000,000; in the event the Offeror elects to purchase less than all of the shares so tendered, the shares purchased will be allocated among sellers tendering their shares on or prior to August 10, 1973 on a pro rata basis, with appropriate adjustments to avoid the purchase of fractional shares. If this Offer is extended, the Offeror will purchase shares tendered during any such extension on a first-come, first-served basis, unless otherwise announced at the time of such extension.

2. **Right to Withdraw Tenders at Certain Times.** Except as stated in this paragraph, tenders are irrevocable. Stockholders who tender their shares pursuant to this Offer may withdraw the shares so tendered until 5:00 P.M., New York time, on August 1, 1973. Shares tendered, unless theretofore purchased by the Offeror, may be withdrawn at any time after September 23, 1973.

3. **Payment of Purchase Price.** Payment for all shares of Common Stock duly tendered and purchased pursuant to this Offer will be made as promptly as practicable after August 10, 1973. If this Offer is extended, payment for shares duly tendered and purchased pursuant to this Offer for which certificates are deposited with the Depositary or a Forwarding Agent during any such extension will be made by the Depositary promptly after good delivery of shares purchased. Certificates for any shares not purchased will be returned without expense to the tendering stockholder as promptly as practicable. Subject to Instruction 6 of the Letter of Tender, the Offeror will pay all transfer taxes, if any, payable on the transfer of tendered shares by virtue of the purchase of the shares by the Offeror. All charges and expenses of the Depositary and the Forwarding Agents will also be paid by the Offeror.

4. **Certain Information Concerning the Company.** The shares of Common Stock are traded on the New York, Toronto, Boston, Cincinnati, Detroit, Midwest, Pacific Coast and PBW Stock Exchanges. The high and low sales prices of the shares reported on the New York Stock Exchange for the periods indicated are as follows:

| | High | Low |
|---|---|---|
| 1970 | $23\frac{1}{4}$ | 13 |
| 1971 | $24\frac{3}{8}$ | $11\frac{1}{4}$ |
| 1972 | $20\frac{3}{4}$ | $14\frac{3}{4}$ |
| 1973—1st Quarter | $25\frac{1}{4}$ | $17\frac{1}{8}$ |
| 2nd Quarter | 24 | $18\frac{3}{4}$ |
| 3rd Quarter (through July 23) | $24\frac{1}{8}$ | $20\frac{3}{8}$ |

The closing price on the New York Stock Exchange on July 23, 1973, was $23\frac{3}{4}$.

The Company is subject to the informational requirements of the Securities Exchange Act of 1934 and in accordance therewith files reports and other information with the Securities and Exchange Commission (the "Commission") relating to its business, financial statements and other matters. Information, as of particular dates, concerning the Company's directors and officers, their remuneration, options granted to them, the principal holders of the Company's securities and any material interest of such persons in transactions with the Company is disclosed in proxy statements distributed to the Company's stockholders and filed with the Commission. Such reports, proxy statements and other information may be inspected at the principal office of the Commission, 500 North Capitol Street, N.W., Washington, D.C. 20549 and copies may be obtained upon payment of the Commission's customary charges. Such material may also be inspected at the library of the New York Stock Exchange, Inc., 11 Wall Street, New York, New York 10005.

The Company's latest Annual Report on Form 10–K filed with the Commission for the fiscal year ended December 31, 1972 states that since 1967 total Canadian operations have contributed approximately 61% of the Company's gross sales and approximately 68% of its operating income (which is calculated before taxes and without giving effect to interest income and expense, corporate and administrative and exploration expenses and extraordinary charges).

5. **Tender of Shares.** Except as hereinafter provided, to tender shares of Common Stock hereunder, certificates for shares, together with a properly executed Letter of Tender and any other required documents (with signatures guaranteed as required by the Instructions on the Letter of Tender), should be transmitted to and received by the Depositary, or a Forwarding Agent, at or prior to 5:00 P.M., New York time, on August 10, 1973, or, if this Offer is extended as herein provided, at or prior to the time specified in such extension (the date and time at which this Offer, as it may be extended from time to time, expires being hereinafter called the "Expiration").

Tenders may be made without the concurrent deposit of stock certificates, if such tenders are made by or through members of any national securities exchange or of the National Association of Securities Dealers, Inc., or by commercial banks or trust companies. In such cases the Letter of Tender, which must be received prior to the Expiration, shall contain a guaranty by such member firm, bank or trust company that, if the shares are accepted, certificates will be deposited with the Depositary or a Forwarding Agent within eight business days after the Expiration. Payment for shares so tendered and purchased will be made only against deposit of the certificates. In all other cases the Letter of Tender must be accompanied by stock certificates.

If a stockholder desires to tender his shares hereunder and time will not permit his Letter of Tender to reach the Depositary or a Forwarding Agent before the Expiration, said tender may be effected if the stock certificates, together with a properly executed Letter of Tender in the accompanying form and any other required documents (with signatures guaranteed as required by the instructions on the Letter

of Tender), have been deposited with a member of any national securities exchange or of the National Association of Securities Dealers, Inc., or a commercial bank or trust company, and the Depositary or a Forwarding Agent has received, at or before the Expiration, a telegram or letter from such member firm, bank or trust company, setting forth the name of the stockholder, the number of shares tendered and the serial numbers of the certificates representing such shares, and stating that the tender is being made thereby and that the stock certificates, together with the Letter of Tender and any other required documents, have been or will be promptly forwarded by such member firm, bank or trust company to the Depositary or a Forwarding Agent. Payment for shares so tendered and purchased will be made only after receipt by the Depositary or a Forwarding Agent of such certificates and Letters of Tender and other required documents.

The delivery of the Letter of Tender and the acceptance of this Offer will constitute an agreement between the tendering stockholder and the Offeror, in accordance with the terms of this Offer and the Letter of Tender, only when the duly signed Letter of Tender, or a telegram or letter (as provided above) from a member of a national securities exchange or of the National Association of Securities Dealers, Inc., or a commercial bank or trust company, is received by the Depositary or a Forwarding Agent.

6. **Dividends and Distributions.** If the Company should declare any dividend (other than a customary quarterly cash dividend declared on or prior to August 10, 1973) or any distribution (whether in cash, securities or other property) on, or issue any rights with respect to, its Common Stock, which are payable or distributable to stockholders of record on a date occurring prior to the transfer into the name of the Offeror on the stock transfer records of the Company of the shares purchased hereunder, then (a) the purchase price per share payable by the Offeror will be reduced by the amount of any cash dividend (other than a customary quarterly cash dividend declared on or prior to August 10, 1973), and (b) the gross amount of any such other dividend or distribution or rights shall be required to be remitted by the tendering stockholder to the Depositary or a Forwarding Agent for the account of the Offeror and pending such remittance or appropriate assurance thereof, the Offeror may withhold the purchase price or deduct from the purchase price the amount or value of such other dividend or distribution or rights as to any shares purchased by the Offeror but not transferred into the name of the Offeror by the record date therefor. If the Company should, during the pendency of this Offer, split its shares of Common Stock or combine or otherwise change its shares of Common Stock, appropriate adjustment in the purchase price, the number of shares offered to be purchased and the fees payable hereunder, will be made.

7. **Certain Conditions of the Offer.** The Offeror shall not be required to purchase or pay for any shares of Common Stock tendered, if before the time of payment therefor:

(a) there shall have been declared in the United States or in Canada any state of war, national emergency, banking moratorium

or, in the State of New York, any suspension of payments by banks, or a general suspension of trading on the New York Stock Exchange; or

(b) there shall have been instituted or threatened any action or proceedings before any court or governmental agency, by any governmental agency or any other person, challenging the acquisition by the Offeror of shares of the Common Stock or otherwise relating to this Offer, or otherwise affecting the Offeror or the Company which is, in the judgment of the Offeror's management, materially adverse; or

(c) the Company shall have (i) issued or authorized or proposed the issuance of, additional shares of capital stock of any class, or securities convertible into any such shares, other than Common Stock issued upon exercise of presently outstanding stock options or warrants or upon conversion of presently outstanding convertible securities, or (ii) issued or authorized or proposed the issuance of, any other securities in respect of, in lieu of, or in substitution for, its now outstanding Common Stock, or (iii) authorized or proposed any merger, consolidation, acquisition of assets, disposition of assets, or material change in its capitalization, or other comparable event not in the ordinary course of business, which, in any case in this paragraph (c), in the judgment of the Offeror's management, makes it inadvisable to proceed with the purchase of, or payment for, any shares of Common Stock; or

(d) any change shall have occurred or be threatened in the business or operations of the Company and its subsidiaries, taken as a whole, which is, in the judgment of the Offeror's management, materially adverse.

**8. Solicitation and Other Fees.** The Offeror will pay to any broker or dealer (including the Dealer Manager) who is a member of a national securities exchange or of the National Association of Securities Dealers, Inc., or to any foreign dealer who agrees to conform to the Rules of Fair Practice of such Association in making solicitations in the United States, or to any commercial bank or trust company ("Soliciting Dealers"), whose name appears in the appropriate space in the Letter of Tender, a solicitation fee of 65¢ for each share purchased hereunder; provided, however, that the maximum fee payable to a Soliciting Dealer in respect of all shares tendered for any one account shall not exceed $3,250. Loeb, Rhoades & Co. will act as Dealer Manager for the Offeror in connection with this Offer; the Offeror will pay such firm a management fee of 10¢ for each share up to 5,000,000 shares purchased by the Offeror pursuant to the Offer and 5¢ for each share in excess of 5,000,000 shares so purchased, but not in excess of $650,000 in the aggregate, and will also reimburse such firm for reasonable out-of-pocket expenses incurred by it as Dealer Manager (which fee and reimbursement of expenses shall not be less than an aggregate of $100,000 in any event). In addition, the Offeror has agreed to indemnify the Dealer Manager against certain liabilities and expenses in connection with the Offer. The Kissel-Blake Organization, Inc. has been retained by the Offeror to solicit acceptances of

this Offer and will receive reasonable and customary compensation for such services. The Depositary and Forwarding Agents will receive reasonable and customary compensation for their services and will be reimbursed for certain out-of-pocket costs in connection with this Offer.

**9. Extension of Tender Period.** The Offeror has no present intention of extending the time within which shares of Common Stock may be tendered hereunder, but expressly reserves the right to extend such period, at any time or from time to time, by written notice of such extension to the Depositary.

**10. Certain Information Concerning the Offeror.** The Offeror is a corporation incorporated by an Act of Parliament of Canada, Statutes of Canada, 19–20 Elizabeth II, c. 49 (the "Act"). The principal executive offices of Offeror are located at 130 Albert Street, Ottawa, K1P 5G4, Ontario, Canada.

The principal objective of Offeror is to help develop and maintain strong Canadian controlled and managed corporations in the private sector of the economy. Offeror's principal business is to make equity investments in selected industries either in new enterprises or in existing companies which have their own staff and management. Offeror does not participate in the day to day operations of such companies but directs general policy, maintains appropriate financial controls, seeks to ensure that they have good management development policies and encourages them to remain innovative and growth oriented.

At the present time Offeror's principal direct and indirect investments include the following companies: Polysar Limited (formerly Polymer Corporation Limited), which is engaged in the manufacture of synthetic rubber, latex and plastics; Raylo Chemicals Limited and R & L Molecular Research Limited, which manufacture fine chemicals and are involved in research related to pharmaceuticals, biochemistry and organic chemistry; Connaught Laboratories Limited, which is engaged in production of vaccines, insulin and blood products; and Omnimedic, Inc., a new holding company formed to acquire and develop operating companies in the pharmaceutical and medical fields. Offeror also has several investments in venture capital companies in Canada, and is a member of the Gas Arctic-Northwest Project Study Group, which is studying economic, environmental and other aspects of the construction and operation of a large diameter natural gas pipeline from Alaska and the Canadian Arctic to markets in Canada and the United States.

At present all the outstanding common shares of Offeror are beneficially owned by the Government of Canada (the "Government"). No other class of shares is outstanding. In addition to any shares or securities of Offeror which may be acquired by the Government in exchange for the Government investments listed in Section 39 of the Act, the Government is permitted under the Act to invest in cash to a maximum of $250,000,000 (Cdn.) in the shares of Offeror. The Government is also authorized to lend to Offeror up to $100,000,000 (Cdn.).

It is the intention of the Act that up to 90% of the voting shares of Offeror ultimately be held by Canadian citizens and residents. No person other than an individual who is a Canadian citizen or a person who is a resident of Canada may purchase, own or hold voting shares of Offeror. Reference is made to the Act for a more complete statement of the permitted ownership of shares of Offeror as well as for the remaining provisions thereof.

Offeror is managed by its own board of directors elected by the voting shareholders. During the period that the total number of voting shares of Offeror held by the Government exceeds 50%, the Deputy Minister of Finance and the Deputy Minister of Industry, Trade and Commerce are ex officio members of the board of directors, but are not entitled to vote. The Act also provides that the Government has the right to appoint annually not more than four directors in lieu of voting the shares held by the Government on any resolution electing members of the board. The present board of directors consists of twenty-three persons, including the two ex officio directors.

It is the present intention of Offeror to make a public offering of its shares in Canada at the earliest practicable date.

The funds to be used by Offeror to purchase shares of the Company's Common Stock tendered pursuant to this Offer will be financed to the extent of approximately $75,000,000 (Cdn.) from Offeror's own funds, which are presently represented by short-term investments; to the extent of $75,000,000 (Cdn.) by a subscription by the Government of Canada to purchase additional shares of Offeror; and to the extent of up to $160,000,000 with funds to be loaned to Offeror by The Toronto-Dominion Bank pursuant to a line-of-credit which has been established by Offeror with such Bank.

The terms of the loan to be made by The Toronto-Dominion Bank are as follows: (a) amounts borrowed under the arrangement will be available on five business days prior notice in multiples of $100,000 but not exceeding $50,000,000 in any one day; amounts taken down shall be for a minimum period of 30 days or such longer periods expressed in multiples of 30 days as Offeror may elect but no amounts borrowed shall mature later than August 1, 1974; (b) the rate of interest on amounts borrowed will be the London-U.S. Dollar Interbank Rate for the appropriate maturities chosen by Offeror plus ⅜ths of 1% per annum; and (c) amounts borrowed may not be prepaid by Offeror.

The obligation of The Toronto-Dominion Bank to loan funds is subject to the following conditions (all of which have been met): (i) an undertaking from Offeror that it will not without the written consent of The Toronto-Dominion Bank dispose of or otherwise encumber any of its assets, including the shares of Common Stock of the Company purchased pursuant to this Offer to Purchase; (ii) the receipt by the Bank of a Letter of Intent from Offeror to issue additional share capital in a minimum amount of $125,000,000 (Cdn.) not later than December 31, 1974; and (iii) an acknowledgment by the Government of Canada that it is obligated to purchase for $125,000,000 (Cdn.) additional Common shares from Offeror not later than December 31, 1974, of which amount not less than $75,000,000 (Cdn.) (which has been

subscribed for as stated above) will be taken down in the current fiscal year of the Government which ends on March 31, 1974. The Offeror has agreed with the Bank that it will devote the proceeds of any offering of shares to the public and/or the Government in excess of the $75,000,000 (Cdn.) which is to be taken down by the Government in its current fiscal year to the repayment of the loans made to Offeror by The Toronto-Dominion Bank. Offeror has also agreed it will endeavour to obtain an undertaking from the Government of Canada to lend $100,000,000 (Cdn.) to Offeror within one year if requested to do so by Offeror and Offeror has agreed to use the proceeds of any such loans to reduce the loans made to it by The Toronto-Dominion Bank.

The purpose of the transaction is to acquire a sufficient number of Common Stock of the Company, which together with such shares of Common Stock now owned by Offeror, will be equivalent to approximately 35% of the outstanding Common Stock of the Company. While this will be less than a majority of the outstanding Common Stock of the Company it is believed that Offeror will have effective control. Offeror does not have any plans or proposals to liquidate the Company, to sell its assets or to merge it with any other company. Offeror cannot state at this time what changes it might seek to make in the management and business of the Company. It intends to review the situation and, if it acquires effective control of the Company, to make such changes as it deems in the best interest of the business of the Company. Offeror will also seek to acquire such representation on the board of directors of the Company as is appropriate to its shareholdings.

In addition, if as a result of the Offer to Purchase Offeror does not acquire effective control of the Company or if other circumstances warrant, it may subsequently elect to acquire additional shares of Common Stock of the Company by purchase on the open market or otherwise on terms which cannot now be predicted (but which may be either less favourable or more favourable to the stockholders of the Company than the price available under the Offer to Purchase).

Offeror is the beneficial owner of 748,800 shares (approximately 2½%) of the outstanding Common Stock of the Company. During the 60 days preceding July 24, 1973, Offeror purchased 292,000 of the shares on the New York Stock Exchange or Toronto Stock Exchange at prices ranging from $20⅞ per share to $23⅛ per share. The last such purchase was made on June 14, 1973.

To the best of the knowledge of Offeror, none of the directors or officers of Offeror or their associates owns beneficially or has a right to acquire, directly or indirectly, any shares of Common Stock of the Company, nor to the best of the knowledge of Offeror has any of them effected any transactions therein during the past 60 days.

Offeror believes that no shares of Common Stock of the Company are owned by the Government or its departmental, agency and proprietary corporations ("Crown Corporations"), that no transactions were effected therein within the last 60 days and that, in any event, any ownership of or transactions in such shares by them are not, in the aggregate, material in relation to the number of shares of Common

Stock of the Company in respect of which the Offer to Purchase is being made. In its quarterly report to shareholders for the quarter ended March 31, 1973, the Company stated that over 20% of its stock was owned by Canadians.

Neither Offeror, the Government, the Crown Corporations, nor any of the officers or directors of Offeror have any contracts, arrangements or understandings with any person with respect to any securities of the Company, including, but not limited to, transfer of any such securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, except as described herein.

The names, business addresses and present principal occupations of the officers and directors of Offeror are as follows:

*Directors:* Laurent Beaudoin, Bombardier Limited, Valcourt, Quebec, President and Chief Executive Officer, Bombardier Limited, (Manufacturer of Recreational Vehicles); Rodolphe B. Casgrain, Suite 1705, 625 Dorechester Blvd. West, Montreal 101, Quebec, President & Managing Director, Casgrain & Company Limited, (Investment Dealer); Francois E. Cleyn, 4 Lorne Avenue, Huntingdon, Quebec, Chairman & President, Cleyn & Tinker Limited (Manufacturers of Textiles); Pierre Cote, 876—4th Avenue, Quebec City, Quebec, President— Laiterie Laval Limited, (Manufacturer of Dairy Products); J. P. Gallagher, 706—7th Avenue, Calgary, Alberta T2P 2H8, President and General Manager, Dome Petroleum Limited, (Exploration, production and transportation of oil and natural gas); Gordon F. Hughes, Ocean Company Limited, 535 Albert Street, Windsor, Nova Scotia, President, Ocean Company Limited, (Financial holding company); Douglas N. Kendall, Suite 1105, 21 King Street East, Toronto, Ontario, Chairman, Kenting Limited, (Transportation and related services to natural resource industry); Sydney Maislin, 7401 Newman Blvd., LaSalle 660, Quebec, President, Maislin Industries Ltd., (Highway transport); Hugh A. Martin, 1455 West Georgia St., Vancouver, B. C., President, Western Construction and Engineering Research Ltd., (Construction company); H. Harrison McCain, Florenceville, New Brunswick, Chairman, McCain Foods Limited, (Processor of frozen foods); W. C. Y. McGregor, Suite 690, 550 Sherbrooke Street West, Montreal 111, Quebec, International Vice-President, Brotherhood of Railway, Airline and Steamship Clerks, (Trade Union); J. H. Moore, Commerce Court, Toronto, Ontario M5L 1R7, President, Brascan Limited, (Holding company with public utility and other diverse interests); Maurice Moreau, Suite 1114, 100 University Ave., Toronto, Ontario, President, Geosearch Consultants Ltd., (Geological Consulting Firm); Frederick W. Sellers, 385 Dawson Road, Winnipeg, Manitoba R2J 058, President, Spiroll Corporation Ltd., (Machinery Manufacturer); F. H. Sherman, Dominion Foundries & Steel Ltd., 1330 Burlington St. East, Hamilton, Ontario L8N 3J5, President & Chief Exec. Officer, Dominion Foundries & Steel Ltd., (Basic Steel Producer); Mme. Livia Thür, University of Quebec, Trois-Rivieres, Quebec, Vice Rector, University of Quebec, (Academic); J. N. Turvey, Interprovincial Steel & Pipe Corporation, Ltd., Highway 6 North, Regina, Saskatchewan,

President, Interprovincial Steel & Pipe Corporation, Ltd., (Basic Steel Producer); Allan F. Waters, 1331 Yonge Street, Toronto, Ontario, President & General Manager, CHUM Limited, (Radio station operator).

*Directors Ex Officio:* J. F. Grandy, Department of Industry, Trade and Commerce, Tower "B," 112 Kent Street, Ottawa, Ontario K1A OH5, Deputy Minister, Department of Industry, Trade and Commerce, (Government of Canada); S. S. Reisman, Department of Finance, 27th Floor, Place Bell Canada, 160 Elgin Street, Ottawa, Ontario K1A 0G5, Deputy Minister, Department of Finance, (Government of Canada).

*Directors Who Are Also Officers:* Marshall A. Crowe, Suite 901, 130 Albert Street, Ottawa, Ontario K1P 5G4, Chairman of the Board of the Offeror; H. Anthony Hampson, Suite 901, 130 Albert Street, Ottawa, Ontario K1P 5G4, President and Chief Executive Officer of the Offeror; Louis R. Desmarais, 759 Victoria Square, Montreal, Quebec, Vice Chairman of the Offeror, President, Power Corporation of Canada Limited, (Investment holding company), President, Canada Steamship Lines Limited, (Marine transportation and services).

*Officers Who Are Not Directors:* Donald C. Morrison, 130 Albert Street, Suite 901, Ottawa, Ontario, Executive Vice-President of the Offeror; Marcel Cazavan, 130 Albert Street, Suite 901, Ottawa, Ontario, Vice-President of the Offeror; H. Hume Wright, 130 Albert Street, Suite 901, Ottawa, Ontario, Vice-President of the Offeror; Claude R. Marchand, 130 Albert Street, Suite 901, Ottawa, Ontario, Secretary and General Counsel of the Offeror; J. W. Blain, Toronto-Dominion Bank Tower, Toronto, Ontario, Partner, Messrs. McCarthy & McCarthy, Barristers and Solicitors, Assistant Secretary of the Offeror.

**11. Miscellaneous.** This Offer to Purchase is not being made to, nor will the Offeror accept tenders from, holders of shares of Common Stock in any state of the United States in which this Offer or the acceptance thereof would not be in compliance with the securities or blue sky laws of such state. In those jurisdictions where the securities laws require this Offer to be made by a licensed broker or dealer, this Offer is made on behalf of the Offeror by one or more registered brokers or dealers who are licensed under the laws of such jurisdictions.

This Offer to Purchase is not being made to, nor will the Offeror accept tenders from, holders of shares of Common Stock who are residents of Canada. Accordingly, no shares will be purchased hereunder from any shareholder if the information contained in the Letter of Tender submitted by such shareholder indicates that such shareholder is a Canadian resident.

The Offeror shall have the absolute right to reject any or all tenders not in proper form or to waive any irregularities or conditions of tender, and the Offeror's interpretation of the terms and conditions of this Offer to Purchase (including the Instructions on the Letter of Tender) will be final.

No dealer or other person has been authorized to give any information or make any representation on behalf of the Offeror other than as contained in this Offer and in the Letter of Tender and, if given or made, such information or representation must not be relied upon as having been authorized.

Questions or requests for assistance or for additional copies hereof and of the Letter of Tender may further be directed to the Dealer Manager, the Depositary, The Kissel-Blake Organiziation, Inc., or the stockholder's broker, dealer, bank or trust company. Properly executed facsimile copies of the Letter of Tender will be accepted. Telephone inquiries may be made by collect telephone call to **Loeb, Rhoades & Co., Syndicate Department (212) 530-4131.**

**The Letter of Tender and certificates for your shares should be sent by you, your broker or bank or trust company to the Depositary or a Forwarding Agent named below:**

CANADA DEVELOPMENT CORPORATION

July 24, 1973

### SCHRODER TRUST COMPANY, *Depositary*

| *Mailing Address* | *Delivery Address* |
|---|---|
| One State Street | One State Street |
| New York, New York 10004 | Sub Cellar 1 |
| Attn: Corporate Agencies Department | New York, New York 10004 |

### *Forwarding Agents*

| **Capital National Bank** | **LaSalle National Bank** |
|---|---|
| 1300 Main Street | 135 South LaSalle Street |
| Houston, Texas 77002 | Chicago, Illinois 60690 |
| Attn: Corporate Trust Dept. | Attn: Corporate Trust Dept. |

UNION BANK
(LOS ANGELES)

4201 Wilshire Boulevard
Los Angeles, California 90010
Mail Delivery: Attn: Corporate Trust Dept.
Hand Delivery: Suite 500

*The Soliciting Agent for this Offer to Purchase is:*

**THE KISSEL-BLAKE ORGANIZATION, INC.**

. 50 Broadway, New York, N.Y. 10004

Tel: (212) 344-6733

*The Dealer Manager of this Offer to Purchase is:*

**Loeb, Rhoades & Co.**

42 Wall Street, New York, N.Y. 10005